IN THE MATTER OF: HOWARD LEWIS MONROE A/K/A MUHAMMED ABDUL

No. 8012DC236

(Filed 7 October 1980)

**Insane Persons § 1.2– involuntary commitment – dangerous to self – dangerous to others**

    Neither the facts recorded by the trial court nor the record in an involuntary commitment proceeding supported the court's conclusion that respondent was "dangerous to himself" where the findings and record showed that respondent was irregular in his sleeping habits and was up from three to six times per night; respondent disregarded his nutritional needs by fasting for some periods and then eating a whole chicken or a whole loaf of bread; respondent ate about five pounds of sugar every two days, sometimes consuming five or six glasses of sweet water per day; and respondent often stood outside his home and made comments to persons passing by the home. However, the court's conclusion that respondent was "dangerous to others" was supported by findings that respondent had become uncontrollable at all times and frequently made threats to his aged and nervous mother that he would "get you all yet;" respondent was suspicious of his family and believed that his familly had sexually seduced him; respondent believed all his relatives were against him; and respondent was "ready to fight" if someone pointed out that he had done something out of order.

APPEAL by respondent from *Bason, Judge.* Order entered 20 November 1979 in District Court, WAKE County. Heard in the Court of Appeals 11 September 1980.

This is a proceeding pursuant to G.S. Chapter 122, Art. 5A, for involuntary commitment of the respondent, Howard Lewis Monroe, to a mental health facility.

On 12 November 1979 Dennis E. Monroe, brother of respondent, petitioned for the involuntary commitment of respondent pursuant to N.C. Gen. Stat. § 122-58.3 *et seq.* He alleged respondent was a mentally ill person who was dangerous to himself or others.

The magistrate found reasonable grounds to believe that the facts alleged in the affidavit were true and ordered that respondent be taken into custody for examination by a qualified physician. Pursuant to this order, respondent was taken into custody on 13 November 1979 and on the same day was examined by a qualified physician who found respondent to be mentally ill or an inebriate and imminently dangerous to himself or others. Respondent was taken to Dorothea Dix Hospital in Raleigh for temporary custody, examination, and treatment pending a hearing in the district court.

The matter was heard at Dorothea Dix Hospital, Wake County, on 20 November 1979, respondent being present and being represented by counsel. At the hearing Patrick Monroe, another brother of respondent, testified that in his opinion respondent was dangerous to himself and to others. Patrick Monroe stated that respondent was "uncontrollable at all times." Respondent often disturbed people in the neighborhood by standing outside the house and making inappropriate comments such as telling them "to hold up their head." Respondent had refused to take medication prescribed for his mental illness. Furthermore, when respondent had taken the medication he was "under control of himself," but when he quit taking it respondent began to "go down" even though the family had encouraged him to continue taking the medication.

Mr. Monroe also testified to respondent's irregular sleeping habits. Respondent was getting up as many as six times during the night which disturbed respondent's elderly mother so she could not sleep. Respondent cooked food at night, often burning

it. In addition, respondent's eating habits were irregular. He "fasted" on some occasions and then would eat as much as a whole chicken or a whole loaf of bread. Respondent would eat five pounds of sugar every two days.

Finally Mr. Monroe related that respondent had made threats to other family members. He had heard respondent say to his mother, "I'm gonna get you all yet." Respondent made further threats to his mother like "Well, I'll get you yet." Respondent would do the opposite of anything his mother told him. Respondent became "upset" and "ready to fight" any time a family member mentioned to respondent that he had done something inappropriate. Respondent's condition had deteriorated gradually but the threats had been increasing over the last three to four weeks.

Petitioner's next witness was Dr. Kent Kalina, respondent's treating physician. Dr. Kalina testified that in his opinion respondent was suffering from a mental illness characterized by changes in attitude and in behavior. Another symptom was the fact that respondent was suspicious of his family and had related to Dr. Kalina that he believed his family had seduced him sexually. While in the hospital, respondent remained suspicious towards his relatives. Dr. Kalina had seen examples of behavior showing that respondent had not exercised proper self-control and judgment. Moreover, respondent was refusing any medication, even though respondent had responded to medication in the past.

Respondent testified in his own behalf as follows:

My name is Muhammad Abdul. I have looked at the commitment papers in this case. I have seen that the name of the petitioner is Dennis Monroe. That person is my brother. That person is not here today. I live with my brother, Dennis Monroe and my mother. I have not lived with my brother Patrick Monroe. I never stayed there. I have lived with my mother a long time. It's been about five or six years.

I usually do drink sugar with water, just like any drink really.

As to what Mr. Patrick Monroe testified to about molesting the neighbors, I told him not to scare the neigh-

bors. He seemed to be in a rush to get to his car. That is the neighbor was in a rush to get to his car. I told him not to scare them.

As to what Mr. Patrick Monroe said about me cooking. He has never seen me cook. He has never been to the house and seen me walking the floor. He lives in a different house on Rufus Street.

At the conclusion of the hearing, the Court made the following findings of fact:

1. The Respondent has been hospitalized at Dorothea Dix Hospital two times since 1975 prior to his current admission.

2. At the time of his last discharge from the hospital the Respondent's physician prescribed medicine for him to take, and his brother purchased the medicine for him. The Respondent took the medicine for only three weeks. The Respondent then refused to take any more of his medicine and stated to his brother, "You might as well give me the money because I will not take that. I don't need it."

3. As long as Respondent was taking his medicine he was in control of himself; but, once he stopped taking his medicine he started going down.

4. He has become uncontrollable at times.

a. During the night he is irregular in his sleeping. He is up from three to six times a night.

b. At other times he is in his front yard or on his porch making all kinds of loud noises or calling inappropriately to anyone passing by and telling them to hold their head up or telling them how they should do.

c. He disturbs the neighborhood at any time.

d. He is frequently making threats to his aged and nervous mother, saying "Well, I'll get you yet." "I'm gonna get you all yet."

e. He gets upset if he is told he is doing something out of order. This makes him "ready to fight." His family must avoid these situations as much as they can.

f. Respondent will do the opposite of what he is asked to do.

5. Respondent disregards his nutritional needs by fasting for some periods and then eating a whole chicken or a whole loaf of bread.

Respondent eats about five pounds of sugar every two days. He will sometimes consume five or six glasses of sweet water.

6. Respondent often cooks late at night and burns the food.

7. On admission to the hospital Respondent was found to be extremely suspicious about his family.

8. Respondent has the paranoid and delusional belief that his family is sexually seducing him and he has accused them of that. He believes that all of his relatives are against him.

9. On a previous hospital admission, Respondent was noted to be lying in bed all day staring up at the ceiling. He wouldn't move. This same type of behavior has been exhibited on his present admission.

10. Respondent has refused medication on this admission.

From the foregoing findings the court concluded as a matter of law that respondent was mentally ill and dangerous to himself and to others and ordered that respondent be committed to Dorothea Dix Hospital for a period not to exceed ninety (90) days.

Respondent appealed to this Court from the foregoing order.

*Attorney General Edmisten, by Associate Attorney Steven F. Bryant, for the State.*

*Dorothy E. Thompson, for the respondent.*

MARTIN (Robert M.), Judge.

N.C. Gen. Stat. § 122-58.7(i) requires as a condition to a valid commitment order that the district court find two distinct facts

by clear, cogent, and convincing evidence: first, that the respondent is mentally ill or inebriate and second, that the respondent is dangerous to himself or others. Prior to 1 October 1979 the statute required a finding that respondent is *imminently* dangerous to himself or others.

It is for the trier of fact to determine whether evidence offered in a particular case is clear, cogent, and convincing. Our function on appeal is simply to determine whether there was any competent evidence to support the factual findings made. *In re Underwood,* 38 N.C. App. 344, 247 S.E. 2d 778 (1978).

Respondent concedes in his brief that there is sufficient evidence to support the court's finding on the issue of mental illness. He contends, however, that there is no competent evidence to support a finding or conclusion of dangerousness to self or to others, either in the facts recorded in the court's order or in the record.

The phrase "dangerous to himself" when used in Article 5A is defined in G.S. 122-58.2(1) as follows:

    a.  "Dangerous to himself" shall mean that within the recent past:

        1.  The person has acted in such manner as to evidence:

            I.  That he would be unable without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of his daily responsibilities and social relations, or to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety; and

           II.  That there is a reasonable probability of serious physical debilitation to him within the near future unless adequate treatment is afforded pursuant to this Article. A showing of behavior that is grossly irrational or of actions which the person is unable to control or of behavior that is grossly inappropriate to the situation or other evidence of severely impaired insight and judg-

ment shall create a prima facie inference that the person is unable to care for himself ....

The statutory language establishes a two prong test for dangerousness to self. The first prong addresses self-care ability regarding one's daily affairs. The second prong, which also must be satisfied for involuntary commitment to result, mandates a specific finding of a probability of serious physical debilitation resulting from the more general finding of lack of self-caring ability. We have held that pursuant to G.S. 122-58.7(i) the facts supporting danger must be recorded by the trial court. *In re Jacobs*, 38 N.C. App. 573, 248 S.E. 2d 448 (1978); *In re Neatherly*, 28 N.C. App. 659, 222 S.E. 2d 486 (1976); *In re Crouch*, 28 N.C. App. 354, 221 S.E. 2d 74 (1976).

We must agree with respondent that neither the facts recorded by the trial court nor the record supports a conclusion or ultimate finding of dangerousness to self. Alternatively, even if indicative of some danger, the facts do not support the finding that "[t]here is a reasonable probability of serious physical debilitation to the Respondent within the near future ...."

The court found that respondent is irregular in his sleeping habits and is up from three to six times per night; that he disregards his nutritional needs by fasting for some periods and then eating a whole chicken or a whole loaf of bread; that respondent eats about five pounds of sugar every two days, sometimes consuming five or six glasses of "sweet water" in a day. These facts may be evidence of mental illness, or, under the broad language of § 122-58.2(1) a. 1. I., danger characterized by inability to "exercise self-control, judgment, and discretion in the conduct of his daily responsibilities ...." However, these facts do not meet the second prong of the test, a reasonable probability of serious physical debilitation to him within the near future. The State presented no evidence showing the present or future effect of these irregular dietary habits on respondent. No testimony was presented as to how long or consistently respondent had been eating in this manner. Unusual eating habits alone do not amount to danger as contemplated in the controlling statute.

Respondent's conduct as described by Patrick Monroe relative to speaking to persons passing by his home evinces no danger to himself. The chance that someone will harm respon-

dent in response to this action cannot be found to be evidence of danger to self in accord with *In re Hogan*, 32 N.C. App. 429, 232 S.E. 2d 492 (1977).

This Court has addressed the issue of danger to self on numerous occasions. In *In re Benton*, 26 N.C. App. 294, 215 S.E. 2d 792 (1975), where the trial court had found the respondent to be "dangerous to herself only in that her illness negates her ability to meet her personal needs," we reversed the order of commitment because inability to meet personal needs is not a finding that respondent is imminently dangerous to herself.

When *Benton* was decided the statute required a finding that respondent was *imminently* dangerous. In the present case there is no clear, cogent, and convincing evidence of danger to self regardless of whether one is evaluating "imminence" or "nearness."

Having determined that the evidence is insufficient to support a finding of danger to self, we now consider whether the evidence will support a finding that respondent is dangerous to others.

Prior to 1979, the phrase "dangerous to others" was not defined by statute. G.S. 122-58.2(1) b. now defines "dangerous to others" as follows:

> "Dangerous to others" shall mean that within the recent past, the person has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another or has acted in such a manner as to create a substantial risk of serious bodily harm to another and that there is a reasonable probability that such conduct will be repeated.

Thus, the trial court must find three elements present in order to find that respondent is dangerous to others:

(1) Within the recent past

(2) Respondent has

    (a) inflicted serious bodily harm on another, *or*

    (b) attempted to inflict serious bodily harm on another, *or*

    (c)  threatened to inflict serious bodily harm on another, *or*

    (d)  has acted in such a manner as to create a substantial risk of serious bodily harm to another, and

  (3)  There is a reasonable probability that such conduct will be repeated.

This Court has not required "overt acts" under the former standard of "imminent" danger and the present statutory definition of "dangerous to others" does not require a finding of "overt acts." *In re Ballard*, 34 N.C. App. 228, 237 S.E. 2d 541 (1977); *In re Salem*, 31 N.C. App. 57, 228 S.E. 2d 649 (1976).

Respondent argues that the threats by respondent to his mother do not amount to threats of "serious bodily harm" as required by the statute. We need not decide, however, whether respondent's words, "I'm gonna get you all yet" are sufficient alone to support the finding of dangerousness to others. We must consider respondent's statements in conjunction with all of the other evidence and determine whether the trial court's finding was supported by any competent evidence. *In re Underwood, supra.*

The trial court found as facts that respondent had become uncontrollable at all times and that he frequently had made threats to his aged and nervous mother. This finding was supported by Mr. Patrick Monroe's testimony that he had heard respondent state to his mother "I'm gonna get you all yet" and that the number of threats made by respondent had increased over the last three to four weeks. The court found as fact, based on Dr. Kalina's testimony, that respondent was suspicious of his family, that respondent believed that his family had sexually seduced him, and that respondent believed that all of his relatives were against him. The court also found as fact, based on Patrick Monroe's testimony, that respondent was "ready to fight" if someone pointed out that he had done something out of order.

These findings, supported by the evidence, support the trial court's conclusion that respondent was dangerous to others by acting "in such a manner as to create a substantial risk of

serious bodily harm to another." Therefore, we conclude the judge did not err in signing the order of involuntary commitment.

Affirmed.

Judges VAUGHN and WEBB concur.