In the Matter of Christopher E. FOS-
TER, Alleged to be Seriously
Mentally Impaired, Appellant.

No. 87–1268.

Supreme Court of Iowa.

June 15, 1988.

Davis L. Foster of Barker, Cruise, Kennedy & Foster, Iowa City, for appellant.

J. Patrick White, Co. Atty., and Anne M. Lahey, Asst. Co. Atty., for appellee.

Considered by McGIVERIN, C.J., and LARSON, CARTER, LAVORATO, and ANDREASEN, JJ.

LAVORATO, Justice.

Christopher E. Foster appeals here from a district court decision ordering him to be involuntarily committed for psychiatric evaluation and treatment. Foster, who is incarcerated for second-degree burglary, contends that the district court decision is not supported by substantial evidence of his dangerousness, an element required by statute for involuntary commitment. He argues that his dangerousness cannot be shown by evidence of other prisoners' violent reactions to his unusual behavior. We agree, and reverse and remand with directions.

I. Foster was incarcerated in 1984 after being convicted of second-degree burglary and is serving a ten-year sentence. *See* Iowa Code §§ 713.5, 902.9(3) (1983). A mild mental disorder was noted when he entered Iowa's prison system.

After having disciplinary problems while in the general prison population, Foster underwent voluntary hospitalization and treatment in late 1985. He was diagnosed as having a schizotypal personality and was prescribed medication, which he took only sporadically.

Foster was released from hospitalization after three months but was re-admitted voluntarily in January 1987 following further disciplinary problems. He was then diagnosed as suffering from chronic undifferentiated schizophrenia. During this hospitalization, Foster again took little interest in his treatment program. After two months he was discharged into the Iowa Medical and Classification Center. Dr. Paul Loeffelholz, one of his treating psychiatrists, testified that Foster was not considered dangerous at that time.

On two occasions at the Center, in June and July 1987, Foster provoked fights with other prisoners. The first fight occurred when he claimed this country was Egypt and that he was "Joseph" from the Bible. The second time he claimed he was Christopher Columbus. In neither case, however, was Foster the initial aggressor. Foster's testimony that he had struck the first blow in one fight was characterized by his attorney in oral argument as indicative of his delusions. Dr. Loeffelholz's testimony supported this explanation, and the county attorney took no issue with it.

After these altercations Dr. Loeffelholz again prescribed medication, which Foster took reluctantly for only a week. An appli-

cation for the involuntary hospitalization of Foster was then filed with the district court. *See* Iowa Code § 229.6 (1987).[1] A judicial hospitalization referee found clear and convincing evidence that Foster's judgmental capacity was impaired by a mental illness, paranoid schizophrenia, and that he presented a danger of assaultive behavior. *See id.* at § 229.21(3). The referee ordered Foster to be committed for a complete psychiatric evaluation and appropriate treatment.

Foster appealed the referee's decision to the district court, and a hearing was held. *See id.* at § 229.21(4). Dr. Loeffelholz testified that while there was no imminent likelihood of Foster becoming violent, he might provoke others to violence, although segregation from other prisoners could prevent this risk. According to the doctor, "[i]t is not that [Foster] is seen as a danger to others. It is ... the kind of built-up inability to cope with the words that he expresses and how he expresses himself."

Foster, in his testimony, alleged that one of the fights was provoked by another prisoner's homosexual advances. Foster also claimed to have struck the first blow, but this testimony was contradicted by other accounts of the altercation. When asked about his religious statements to other prisoners, Foster rambled incoherently.

Upon its de novo review, *see id.*, the district court ordered Foster to be committed for evaluation and treatment. The court noted that Foster "is seriously mentally impaired and is likely to injure himself or others if allowed to remain at liberty without medication."

Foster then brought this appeal. He argues that the district court's decision is not supported by substantial evidence of his dangerousness, an element of "serious mental impairment" that must be proven under Iowa Code section 229.1(2) before involuntary commitment can be ordered. The only danger here, Foster contends, is

from the potentially violent reactions of other prisoners to his unusual statements.

The applicant for commitment maintains that the dangerousness element was satisfied because Foster provoked fights with his bizarre statements. The applicant claims it is irrelevant that Foster was not the initial aggressor.

■■■ II. Involuntary civil commitment proceedings are special actions triable to the court. *In re Mohr*, 383 N.W.2d 539, 541 (Iowa 1986). The district court's findings of fact are the equivalent of a special verdict and are binding on us if supported by substantial evidence. *Id.* We view evidence to be "substantial" if a reasonable mind would accept it as adequate to reach a conclusion. *C.F. Sales, Inc. v. Amfert, Inc.*, 344 N.W.2d 543, 553 (Iowa 1983).

■ Before commitment is warranted, the applicant[2] must establish by clear and convincing evidence all of the elements of "serious mental impairment" in Iowa Code section 229.1(2). *Mohr*, 383 N.W.2d at 541; Iowa Code § 229.12(3). In addition, a presumption operates in favor of the respondent.[3] Iowa Code § 229.12(3).

■ "Serious mental impairment" in section 229.1(2) describes

the condition of a person who is afflicted with mental illness and because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment, and who:

a. Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment; or

b. Is likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the afflicted person if the afflicted person is allowed to remain at liberty without treatment.

This definition has three elements:

The respondent must be found to be (1) "afflicted with a mental illness," conse-

---

1. All references are to the 1987 Iowa Code unless otherwise indicated.

2. The applicant is the party initiating the proceedings. *See* Iowa Code § 229.6.

3. The respondent is the party against whom the proceedings are brought. *See* Iowa Code § 229.1(4).

quently (2) to lack "sufficient judgment to make responsible decisions with respect to [the person's] hospitalization or treatment," and (3) to be likely, if allowed to remain at liberty, to inflict physical [self-injury or injury on others,] or to inflict emotional injury on the designated class of persons.

*In re Oseing,* 296 N.W.2d 797, 799 (Iowa 1980). Only the third element is at issue in this appeal, and only to the extent to which Foster would be likely to inflict physical injury on himself or others.[4] Regarding this element the district court simply made the following finding of ultimate fact: "That respondent, Christopher E. Foster, is seriously mentally impaired and is likely to injure himself or others if allowed to remain at liberty without medication." Our task is to determine whether there is substantial evidence to support this finding. Our review of the record convinces us there is not.

The word "likely" in the third element means "probable or reasonably to be expected." *Oseing,* 296 N.W.2d at 801; *accord Mohr,* 383 N.W.2d at 542. Thus, the court must make a predictive judgment about whether the respondent poses a danger to himself or others. *Oseing,* 296 N.W.2d at 801. Evidence to support that judgment must come in the form of a "recent overt act, attempt or threat." *Stamus v. Leonhardt,* 414 F.Supp. 439, 451 (S.D.Iowa 1976); *accord Mohr,* 383 N.W.2d at 542; Iowa Sup.Ct.R. for Involuntary Hospitalization of Mentally Ill 13(10) ("physician's diagnosis and recommendations" must include "a detailed statement of the facts, symptoms and overt acts observed or described to him or her, which led to the diagnosis").

Dangerousness is embodied in the third element of the definition of serious mental impairment as "constitutionally necessary ... to provide a justification for depriving individual liberty under the state's police power." *B.A.A. v. Chief Medical Officer,* 421 N.W.2d 118, 124 (Iowa 1988). Incarceration under the police power is based on past conduct. In contrast, civil commitment under the dangerousness standard "permits confinement and treatment on the basis of *predicted* behavior." Bezanson, *Involuntary Treatment of the Mentally Ill in Iowa: The 1975 Legislation,* 61 Iowa L.Rev. 262, 284 (1975) (emphasis added). In this sense, civil commitment is one of the rare forms of preventive confinement in this country. *Id.* at 284–85.

One commentator explains the need for evidence of past conduct to support a predictive judgment of dangerousness:

> If a case were to be hypothesized in which future harmful conduct were perfectly predictable, there would be little question concerning the state's power to take appropriate preventive measures, including incarceration where necessary. On the other hand, it would be equally clear that with little or no basis for predicting future conduct the state would be constitutionally prohibited from taking incarcerative action, for no rational relationship could be established between the state's purpose of preventing harm and the means selected to that end—confinement of an individual.

Bezanson, 61 Iowa L.Rev. at 285.

Stringent proof under the dangerousness standard is necessary because predicting

---

**4.** The applicant chose to invoke the provisions of Iowa Code ch. 229 by filing, under § 229.6, an application for the involuntary hospitalization of Foster. The hearing in the district court was conducted pursuant to ch. 229.

Clearly, Foster is entitled to the procedural protections of ch. 229 even though he is incarcerated. *See Vitek v. Jones,* 445 U.S. 480, 487–95, 100 S.Ct. 1254, 1261–65, 63 L.Ed.2d 552, 561–66 (1980) (involuntary transfer of a prisoner to a mental hospital implicates a liberty interest that is protected by the due process clause of the fourteenth amendment to the U.S. Constitution, thereby entitling the prisoner to such procedural protections as written notice of the transfer, an advisory hearing before an independent decisionmaker, written findings, and effective and timely notice of such rights); *United States ex rel. Schuster v. Herold,* 410 F.2d 1071, 1073 (2d Cir.) (prisoners transferred to mental hospitals from state prisons have right to same procedures used to civilly commit other citizens of the state), *cert. denied,* 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1969). *Vitek,* however, does not answer the question whether the prisoner is entitled to the substantive protections afforded by Iowa Code § 229.1(2). Like the applicant we assume, without deciding, that he is.

dangerousness is difficult and, at best, speculative. According to Bezanson,

> [s]ome studies, for example, have concluded that the mentally ill as a group are less dangerous than members of society at large. Others have concluded that the heightened danger is only slight. Even more important, the most successful efforts at predicting dangerous future conduct have proven accurate in no more than 40 percent of the cases where future danger has been predicted. This means that in 60 percent of the cases in which dangerousness had been predicted, the prediction was incorrect.

61 Iowa L.Rev. at 288; *see also* Contemporary Studies Project, *Involuntary Hospitalization of the Mentally Ill in Iowa: The Failure of the 1975 Legislation,* 64 Iowa L.Rev. 1284, 1384–85 (1979) (referring to studies showing that absent prior history of violence, no psychiatrist or other mental health expert can reliably determine whether a person is dangerous); Diamond, *The Psychiatric Prediction of Dangerousness,* 123 U.Pa.L.Rev. 439, 447–52 (1974) (psychiatrists cannot predict danger with reasonable accuracy because there is no clear-cut association between mental illness and dangerous behavior and no means of prediction exists).

The uncertainty of predicting dangerousness convinced the United States Supreme Court to require, as a matter of due process, proof of mental illness and dangerousness by clear and convincing evidence rather than proof by merely a preponderance of the evidence. *Addington v. Texas,* 441 U.S. 418, 425–33, 99 S.Ct. 1804, 1809–13, 60 L.Ed.2d 323, 330–35 (1979); *accord Stamus,* 414 F.Supp. at 449. Requiring this standard of proof also " 'reflects the value society places on individual liberty.' " *Addington,* 441 U.S. at 425, 99 S.Ct. at 1809, 60 L.Ed.2d at 330.

On the other hand, the Court refused to adopt a reasonable doubt standard because the "lack of certainty and the fallibility of psychiatric diagnosis [presented] a serious question ... whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous." *Id.* at 429, 99 S.Ct. at 1811, 60 L.Ed.2d at 333; *accord* Contemporary Studies Project, *Facts and Fallacies About Iowa Civil Commitment,* 55 Iowa L.Rev. 895, 970 (1970).

We agree with the assessment that the "possibility of such inaccuracies makes it imperative that the protections surrounding application of the dangerousness standard be substantial, and that its ultimate administration by the trier of fact be both responsible and based on a sober appreciation of the standard's inadequacies and limitations." Bezanson, 61 Iowa L.Rev. at 289.

■ Against this backdrop we turn to the narrow issue confronting us: whether Foster's conduct that gave rise to the two assaults against him constitutes an "overt act" that shows Foster is likely to inflict physical injury on himself or others. Resolution of this issue turns on the meaning of "overt act."

"Overt act" is defined as one "done in pursuance and manifestation of an intent or design." *Black's Law Dictionary* 995 (5th ed. 1979). In the context of civil commitment we hold that an "overt act" connotes past aggressive behavior or threats by the respondent manifesting the probable commission of a dangerous act upon himself or others that is likely to result in physical injury.[5] *See* Bezanson, 61 Iowa L.Rev. at 312–13 ("It should be noted at the outset that the type of injury cognizable under [Iowa Code section 229.1(2)(a) ] is physical injury to self or other persons."); *see also Lynch v. Baxley,* 386 F.Supp. 378, 391 (M.D.Ala.1974) (dangerousness indicates likelihood of positive infliction of injury), *rev'd on other grounds,* 651 F.2d 387 (5th Cir.1981); *In re Goedert,* 180 Mont. 484, 487, 591 P.2d 222, 224 (1979) (overt act manifests the commission of a dangerous act upon another).

We reject the applicant's argument that the overt act itself need not necessarily

---

**5.** We are here concerned with the physical injury component of Iowa Code § 229.1(2)(a) rather than the emotional injury component of § 229.1(2)(b).

involve a threat or an act of unprovoked physical aggression on the part of the respondent. Such an approach would tend to increase the incidence of error in predicting dangerousness, thus compounding the problem of uncertainty in this area.

Although there are only a few cases on the meaning of overt act in the context of civil commitment proceedings, those cases tend to support our definition of it. *See, e.g., In re M.C.,* — Mont. —, —, 716 P.2d 203, 207 (1986) ("Overt acts include behavior such as a threat to take one's life, ... a threat to kill, ... and verbal abuse coupled with aggressive physical action such as being 'armed' with a baseball bat...."). The facts in one of those cases closely parallel the facts here. *See In re Hogan,* 32 N.C.App. 429, 232 S.E.2d 492 (1977).

In *Hogan,* a psychiatrist testified that the respondent's persistence in trying to preach on the streets might cause people to resist and become physically aggressive toward her. Based on this testimony the trial court found that the respondent was "imminently dangerous to herself or others" and committed her. *Hogan,* 32 N.C. App. at 432, 232 S.E.2d at 493–94. Reversing, the appellate court observed that the only competent evidence presented at the hearing bearing on the question whether respondent was imminently dangerous to herself or others was contained in the testimony of [the psychiatrist]. Although [the psychiatrist] signed a statement that in his opinion respondent was imminently dangerous to herself or others, at the hearing he testified that he "didn't get any indication that she was aggressively motivated in that sense of being physically violent." Indeed, it is abundantly clear from his testimony given at the hearing that he arrived at his opinion that respondent was imminently dangerous to herself or others solely because he felt that her persistence in trying to convert someone on the street might cause that person to resist the idea, so that "they could become physically aggressive toward her." If so, it would seem more appropriate to commit her aggressor rather than the respondent.

*Id.* at 434, 232 S.E.2d at 495; *accord In re Monroe,* 49 N.C.App. 23, 29–30, 270 S.E.2d 537, 540 (1980).

Similarly, in this case Dr. Loeffelholz conceded that Foster was not the aggressor on the two occasions in question. He also conceded that there was no imminent likelihood of Foster becoming violent.

The danger the doctor perceived was that Foster's verbalized delusions about being Christopher Columbus or Joseph from the Bible and this country being Egypt could provoke acts of aggression toward him by other inmates. We agree with Foster that such conduct, even though bizarre, does not constitute the type of overt act necessary to establish dangerousness.

Provoking acts of aggression toward oneself by bizarre or socially unacceptable behavior does not elevate such behavior to a level of likely physical injury to oneself. In the context of a civil commitment proceeding, harm to oneself is defined in terms of neglect or inability to care for oneself, a condition the applicant does not argue exists here. *See Stamus,* 414 F.Supp. at 451; *Monroe,* 49 N.C.App. at 28–29, 270 S.E.2d at 540. We do not confine people simply because their conduct is unusual or bizarre. *In re Mohr,* 383 N.W.2d 539, 542 (Iowa 1986); *see also O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396, 407 (1975) ("Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty.").

The prison authorities may have to put Foster in protective custody, a possibility Foster readily recognizes and accepts. *See* I. Robbins, *Prisoners and the Law* 14–16 (1987). Such a status would cost Foster certain freedoms, which, again, he readily recognizes and accepts. Nevertheless, the benefit, as he puts it, is that he can make his own decision whether to take medication, something he has consistently resisted. Moreover, protective custody would be the least restrictive alternative to enforced hospitalization and treatment, a policy underlying our mental commitment

statute. *See generally* Bezanson, 61 Iowa L.Rev. 348–64.

III. We hold that there was not substantial evidence to support the district court's finding that Foster is likely to injure himself or others if allowed to remain at liberty in the general prison population without medication. Thus, the applicant failed to establish by clear and convincing evidence that Foster is seriously mentally impaired. Accordingly, the district court's order of involuntary commitment is reversed, and this case is remanded to the district court with directions to terminate Foster's involuntary commitment for hospitalization and treatment.

REVERSED AND REMANDED WITH DIRECTIONS.