# IN THE COURT OF APPEALS OF IOWA

No. 18-0393
Filed November 7, 2018

IN THE MATTER OF T.K.,
Alleged to be Seriously Mentally Impaired,

T.K.,
　　　Respondent-Appellant.
_____

　　　Appeal from the Iowa District Court for Johnson County, Christopher L.
Bruns, Judge.


　　　T.K. appeals a district court order finding her seriously mentally impaired.
**AFFIRMED.**


　　　Sandra R. Hart of Hart Law, North Liberty, for appellant.

　　　Thomas J. Miller, Attorney General, and Gretchen Witte Kraemer, Special
Assistant Attorney General, for appellee State.


　　　Considered by Danilson, C.J., and Vogel and Tabor, JJ.

**TABOR, Judge.**

T.K.'s unsafe behavior during the "frigid weather" last winter prompted her brother and her neighbor to seek mental health treatment on her behalf. In response to their affidavits and a psychiatric evaluation at the University of Iowa Hospitals and Clinics (UIHC) in Iowa City, a judicial hospital referee committed T.K. on an outpatient basis. The district court affirmed the involuntary commitment, finding T.K. suffered from a serious mental impairment and was likely to physically injure herself if she remained at liberty without treatment. On appeal, T.K. disputes the district court's finding she poses a threat to herself if allowed to remain at liberty without treatment. Because we find substantial evidence supports the district court's findings, we affirm.

## I.      Facts and Prior Proceedings

In late November 2017, T.K. made her monthly call to her brother Mark, who lives out of state. During the call, T.K. made comments that worried her brother. For example, she described being followed and having her communications intercepted. She also disbelieved and misremembered recent and more distant past events. In December, T.K. performed demolition in her home and left significant debris in her yard. In "bitterly cold" temperatures, T.K. walked to her neighbor's house barefoot and without a coat to apologize for yelling the day before. The neighbor contacted Mark with concerns about T.K.'s well-being. Another neighbor contacted police, alleging T.K. had caused property damage. T.K.'s long-time boyfriend, Michael, entered T.K.'s home to find the thermostat removed and the heat left on high. T.K.'s dogs were not doing well, and Michael was concerned the house had elevated levels of carbon monoxide.

On December 28, Mark filed an application alleging T.K. suffered from serious mental impairment. His application asserted T.K. posed a danger to herself or others and lacked judgmental capacity. In support, he provided an affidavit detailing his observations, in addition to an affidavit from T.K.'s neighbor. Under court order, UIHC admitted T.K. to its psychiatric ward. While there, T.K. displayed symptoms of paranoia. She also refused to allow UIHC access to medical records from institutions where she previously received mental-health and substance-abuse treatment. Before T.K.'s admission, she was prescribed a high dose of stimulants and a "modest prescription" for benzodiazepines. Doctors evaluated T.K. twice during the in-patient commitment, seeing improvement in her symptoms when she took her medication.

At a January 5 hearing before the judicial hospitalization referee, T.K. stipulated she met the elements necessary for a finding of serious mental impairment:[1] judgmental capacity, treatability, dangerousness, and mental illness. The hearing was not reported, nor did the parties enter a written stipulation into the

---

[1] "*Seriously mentally impaired*" or "*serious mental impairment*" describes the condition of a person with mental illness and because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment, and who because of that illness meets any of the following criteria:

*a.* Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment.

*b.* Is likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the person with mental illness if the person with mental illness is allowed to remain at liberty without treatment.

*c.* Is unable to satisfy the person's needs for nourishment, clothing, essential medical care, or shelter so that it is likely that the person will suffer physical injury, physical debilitation, or death.

Iowa Code § 229.1(20) (2018).

record.  The referee ordered a complete psychiatric evaluation on an outpatient basis and discharged T.K. to outpatient treatment.

T.K. filed a handwritten notice of appeal on January 9 challenging the finding of mental impairment.  After filing the appeal, she filled one prescription on January 11 but did not pursue refilling another prescription despite her primary care physician's direction she follow up with a psychiatrist.  She also failed to appear at her outpatient evaluation appointment scheduled for February 7.

On February 8, the district court held a de novo hearing on T.K.'s appeal.  In its review, the district court considered Mark's application and accompanying affidavits, as well as three reports from the hospital's chief medical officer summarizing T.K.'s psychiatric examinations.  The court also heard testimony from T.K.'s attending psychiatrist, Dr. Judith Crossett, and T.K. herself.

Dr. Crossett testified to gathering T.K.'s history from the "escalating report of bizarre and dangerous behavior" from her brother.  Dr. Crossett likewise incorporated the neighbor's concerns about T.K. "yelling and screaming late into the night" and "showing up at the neighbor's door" with "no coat, no shoes" in late December.  The psychiatrist also considered information she received from T.K.'s boyfriend that the house was in disarray and T.K. removed the thermostat from the wall because "it was spying on her."  Michael found T.K. left the furnace "just full on."  "The house was 90 degrees inside," leaving Michael concerned about carbon monoxide poisoning.  Dr. Crossett described her impression of T.K. at the hospital as "quite irritable" and "very guarded" about her condition.

For her part, T.K. testified she was wearing a coat when she went to the neighbor's house but admitted going barefoot.  T.K. claimed she had broken a toe

5

and was unable to get her shoe on. She also testified she "wanted to freeze [the toe] before [she] got into the shower." She explained, "It's just a sports thing to do. I've broken it a couple times before and it helps." T.K. attributed the disarray and lack of thermostat to her renovations. She also said the debris on her lawn included items former neighbors left at her house.

The district court found the State proved T.K. had a serious mental impairment by clear and convincing evidence "even absent the stipulation" in place at the referee hearing. The court issued an order confirming T.K.'s placement in outpatient commitment. T.K. appeals.

## II.     Scope and Standard of Review

We review challenges to the sufficiency of the evidence in involuntary-commitment proceedings for correction of legal error. *In re B.B.*, 826 N.W.2d 425, 428 (Iowa 2013). We are bound by the factual findings when supported by substantial evidence. *In re L.H.*, 890 N.W.2d 333, 340 (Iowa Ct. App. 2016). "The allegations made in the application for involuntary commitment must be supported by clear and convincing evidence." *In re J.P.*, 574 N.W.2d 340, 342 (Iowa 1998). We consider evidence "clear and convincing" when there is "no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *Id.* (citation omitted).

## III.     Analysis

**Stipulation.** The State argues T.K.'s stipulation to meeting the criteria for serious mental impairment, referenced in the referee's order, remains in force on appeal. It is true we ordinarily enforce stipulations absent fraud, collusion, mistake,

accident, or surprise. *See In re Z.H.*, No. 15-1943, 2016 WL 4384363, at *2 (Iowa Ct. App. Aug. 17, 2016). The trouble here is a deficient record.

At the de novo hearing, Dr. Crossett testified it was her understanding T.K. "chose to stipulate rather than have her brother called as a witness for the hearing" with the judicial hospital referee. But no signed stipulation appears in the district court record. And the State did not ask T.K. about her prior stipulation during the district court hearing.

Nor is there a record of the hearing before the judicial hospitalization referee. The only evidence T.K. stipulated to the elements of serious mental impairment is the referee's findings of fact and order.[2] Moreover, the district court did not base its finding on the stipulation. *See* Iowa Code § 229.21(3)(c) (2018) ("When appealed, the matter shall stand for trial de novo."). For these reasons, we do not rely on T.K.'s stipulation to serious mental impairment.

**Serious Mental Impairment.** Chapter 229 authorizes involuntary civil commitment if a person "has a serious mental impairment." Iowa Code § 229.13(1). The statutory definition of serious mental impairment includes three elements. The person must: (1) have a mental illness; (2) as a result of the mental illness, lack "sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment"; and (3) be likely, if allowed to remain at liberty, to either inflict physical or serious emotional injury to themselves or another, or be unable to satisfy their own basic physical needs. *Id.* § 229.1(20); *see also*

---

[2] In addition to the stipulated elements of serious mental impairment, the order stated, "Respondent began the hearing, but decided prior to the close of the State's case to stipulate to the entry of the outpatient order requested by UIHC. Her stipulation was taken on the record."

*J.P.*, 574 N.W.2d at 343. Courts generally call the last element "dangerousness," as it requires a showing of danger posed to the person or others. *See, e.g.*, *B.A.A. v. Chief Med. Officer*, 421 N.W.2d 118, 123 (Iowa 1988) (examining dangerousness as prerequisite to involuntary commitment). On appeal, T.K. does not dispute the court's finding of mental illness or lack of judgment. She challenges only the sufficiency of the State's proof of dangerousness.

**Dangerousness.** Dangerousness can manifest in three ways: (1) a likelihood to physically injury one's self or others; (2) a likelihood of inflicting serious emotional injury on others; or (3) an inability to satisfy one's own needs for nourishment, clothing, essential medical care, or shelter, making physical injury, debilitation, or death likely. Iowa Code § 229.1(20)(a)–(c).

A finding of dangerousness under each means requires proof of a recent overt act, attempt, or threat. *L.H.*, 890 N.W.2d at 341. An overt act is aggressive behavior or threats signaling "the probable commission of a dangerous act upon [her]self or others" likely to result in injury. *In re Foster*, 426 N.W.2d 374, 378 (Iowa 1988).

The court's commitment order focused on the danger T.K. posed to herself.[3] "In the context of a civil commitment proceeding, harm to oneself is defined in terms of neglect or inability to care for oneself." *Id.* at 379. In particular, T.K. showed an inability to satisfy her needs for clothing against the elements, essential medical care, and safe shelter—posing a likelihood her mental illness would lead to physical injury.

---

[3] One of T.K.'s psychiatric evaluations also cited distress to neighbors and T.K.'s boyfriend Michael as emotional injury to others resulting from T.K.'s mental illness.

At its core, the district court's finding of dangerousness centered on the likelihood T.K. would neglect her essential needs and injure herself. Substantial evidence supported its finding. In its evaluation, the district court was free to reject T.K.'s explanation of her late December behavior as simply an unconventional treatment for a broken toe. Rather than seeking medical attention for her broken toe, T.K. risked frostbite to both feet by walking barefoot outside in bitterly cold temperatures. The district court was also entitled to give more weight to the neighbor's account T.K. was not wearing a coat, leaving her without protection from the elements.

As the district court noted, T.K. also revealed her inability to care for herself by "disabling or not properly enabling her home heating system." Like the excuse for her barefoot walk, T.K.'s account of renovating her heating system in midwinter without the funds to complete the repairs did not ring true with the district court. Her actions demonstrated an inability to maintain safe shelter.

In addition to her risky pre-commitment behavior, T.K. continued to disregard her essential medical care after the referee ordered T.K. to engage in outpatient treatment. T.K. did not attend scheduled treatment, filled a necessary prescription late, and failed to seek a refill on another psychiatric medication. These lapses evince T.K.'s continuing neglect of her mental health.

In short, T.K.'s erratic behavior demonstrated her inability to meet the basic needs of clothing and housing appropriate to the weather. She also failed to make responsible decisions about her physical and mental health care. The record supports the district court's finding T.K. meets the "dangerousness" element of

serious mental impairment.  Accordingly, we affirm the outpatient commitment order.

**AFFIRMED.**