## IN THE COURT OF APPEALS OF IOWA

No. 18-1498
Filed May 15, 2019

IN THE MATTER OF D.M.
Alleged to Be Seriously Mentally Impaired,

D.M.,
        Respondent-Appellant.
_____

Appeal from the Iowa District Court for Des Moines County, Mark E.

Kruse, Judge.


D.M. appeals the court's ruling of serious mental impairment.  **AFFIRMED.**


Curtis Dial of Law Office of Curtis Dial, Keokuk, for appellant.

Thomas J. Miller, Attorney General, and Gretchen Kraemer, Assistant

Attorney General, for appellee State.


Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

D.M. challenges the trial court's finding of serious mental impairment, claiming there is insufficient evidence that he poses a risk to his own or others' safety. In light of D.M.'s recent suicidal ideations, refusal to follow-through with mental-health treatment, a telephoned threat to a former employer, and the recent purchase of AR15 rifle, we find clear and convincing evidence to support the court's finding that D.M. poses a risk to himself or others. We therefore affirm.

On August 8, 2018, D.M.'s septuagenarian parents sought assistance from law enforcement because D.M. was suicidal and had purchased a weapon. D.M. was hospitalized and evaluated.

The evaluating psychiatrist, Dr. Amanda Winter, submitted an initial report on August 13 in which she stated: (1) D.M. was experiencing a major depressive disorder, alcohol abuse, and had antisocial and narcissistic personality traits that contributed to the risk of impulsive acts of harm to himself or others; (2) D.M. was not capable of making responsible decisions with respect to treatment; and (3) based on D.M.'s self-reporting, he was not then likely to harm himself or others. However, on April 14—the day of the involuntary commitment hearing—Dr. Winter submitted an amended report. Dr. Winter reported the need for more time to gather information and evaluate D.M.'s likelihood of harming himself or others, stating, "[B]ased on new information that continues coming to light, it is more and more likely that he is not being truthful about his intents and motivations."

At the hearing on the allegations of serious mental impairment, Dr. Winter testified she spoke to several sources[1] who indicated D.M. had "significant suicidal ideation with a plan to use the gun to kill himself." D.M. had been engaged in psychiatric care with Dr. Sanchez and had agreed he would not purchase firearms but had then purchased an AR15.[2] Dr. Winter testified that upon learning of the purchase, Dr. Sanchez did not feel comfortable having D.M. as a patient. Dr. Winter further testified that "[d]ue to the severity of [D.M.'s] depression, along with the alcohol abuse and the effects of his wife's death," she believed that if left untreated, D.M. would be a danger to himself or others. She stressed D.M's "behavior is quite impulsive," and those with "poor impulse control are always left at increased risk for harming themselves or others due to unforeseeable circumstances and unpredictable stressors that come up."

Lieutenant Brett Grimshaw testified concerning a report received just before D.M.'s hospitalization from D.M.'s former employer that D.M. had called and made threats. D.M.'s telephone call prompted the employer to have an armed deputy on the property and to request law enforcement provide security. Lieutenant Grimshaw testified law enforcement provided the employer active-shooter training that day as a result of D.M.'s call because "[t]hey demanded it" because many employees "didn't want to come to work."

D.M.'s sister testified that though D.M. was "saddened" by his wife's recent death, he was not a danger to anyone. However, she testified she was

---

[1] Dr. Winter had communicated with D.M.'s therapist, Dr. Sanchez; Dr. Labio, who had evaluated D.M. at the time of admission; and with Officer Kevin Glendening about the weapon D.M. had purchased.

[2] D.M. told Dr. Winter the weapon was a target model. However, Glendening informed Dr. Winter it was a "full-use AR15 tactical weapon."

not aware D.M. had recently purchased a firearm, that their mother had reported her concern for officers' safety should they go to D.M.'s house, or that D.M. was discharged from treatment with Dr. Sanchez.

The court found clear and convincing evidence supported a finding that D.M. was seriously mentally impaired under Iowa Code chapter 229 (2018). The court noted Dr. Winters testified she believed D.M. was a danger to himself or others—though she "then indicate[d] she doesn't have sufficient statements before her or sufficient outside information" to determine whether D.M. was being truthful when he told her "I'm not a danger to myself or I'm not going to do anything." Still, the court concluded:

> In this particular case, that outside information tips the balance because it's very clear that that information, if true, and I think it is true, that you made threats, put an entire business on alert of you coming after them, possibly with a gunman, so for that reason I believe that each of the elements was shown in this case by clear and convincing evidence.

D.M. appeals, contending there is not clear and convincing evidence that he poses a risk of danger to himself or others.

We review rulings of involuntary commitment for serious mental illness under Iowa Code chapter 229 for corrections of errors at law. *In re B.B.*, 826 N.W.2d 425, 428 (Iowa 2013). The district court's findings of fact are binding if they are supported by substantial evidence. *In re J.P.*, 574 N.W.2d 340, 342 (Iowa 1998). "Evidence is substantial if a reasonable trier of fact could conclude the findings were established by clear and convincing evidence." *In re B.T.G.*, 784 N.W.2d 792, 796 (Iowa Ct. App. 2010).

The statutory definition of serious mental impairment includes three elements. The person must: (1) have a mental illness; (2) as a result of the mental illness, lack "sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment"; and (3) be likely, if allowed to remain at liberty, to either inflict physical or serious emotional injury to themselves or another, or be unable to satisfy their own basic physical needs. Iowa Code § 229.1(20); *see also J.P.*, 574 N.W.2d at 343. Courts generally call the last element "dangerousness," as it requires a showing of danger posed to the person or others. *See, e.g., B.A.A. v. Chief Med. Officer*, 421 N.W.2d 118, 123 (Iowa 1988) (examining dangerousness as prerequisite to involuntary commitment). On appeal, D.M. does not dispute the court's finding of mental illness or lack of judgment. He challenges only the sufficiency of the State's proof of dangerousness.

Dangerousness can manifest in three ways: (1) a likelihood to physically injury one's self or others; (2) a likelihood of inflicting serious emotional injury on others; or (3) an inability to satisfy one's own needs for nourishment, clothing, essential medical care, or shelter, making physical injury, debilitation, or death likely. Iowa Code § 229.1(20)(a)–(c).

A finding of dangerousness under any of the alternatives requires proof of a recent overt act, attempt, or threat. *In re L.H.*, 890 N.W.2d 333, 341 (Iowa Ct. App. 2016). "An 'overt act' is 'past aggressive behavior or threats by the respondent manifesting the probable commission of a dangerous act upon himself or others that is likely to result in physical injury.'" *Id.* (quoting *In re Foster*, 426 N.W.2d 374, 378 (Iowa 1988)).

There is substantial evidence supporting the court's finding of dangerousness. D.M.'s family called law enforcement due to his acquisition of an AR15 and suicidal threats. D.M.'s therapist terminated their therapeutic relationship because she had asked him not to purchase a weapon and he disregarded this request. D.M. threatened a former employer who took the threats seriously and insisted on active-shooter-response training from law enforcement and that security measures be taken. We therefore affirm.

**AFFIRMED.**