# IN THE COURT OF APPEALS OF IOWA

No. 24-1083
Filed February 5, 2025

**IN THE MATTER OF M.D., ALLEGED TO BE SERIOUSLY MENTALLY IMPAIRED,**

**M.D.,**
      **Respondent-Appellant.**
_____

Appeal from the Iowa District Court for Des Moines County, Shane M. Wiley, Judge.

The respondent appeals a district court order that found she is seriously mentally impaired and involuntarily committed her for treatment. **REVERSED AND REMANDED WITH DIRECTIONS.**

Frederic C. Hayer of Aspelmeier, Fisch, Power, Engberg & Helling, P.L.C., Burlington, for appellant.

Brenna Bird, Attorney General, and Sarah Anne Jennings, Assistant Attorney General, for appellee State.

Considered by Schumacher, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

M.D. appeals a district court order that found she is seriously mentally impaired and involuntarily committed her for inpatient treatment. She claims there was insufficient evidence presented at the civil commitment hearing to establish the endangerment element for "serious mental impairment" under Iowa Code section 229.1(22) (2024). We agree based on the sparse record before us.

## I.  Background Facts and Proceedings

In June 2024, an application was filed alleging that M.D. was suffering from a serious mental impairment. An affidavit was attached to the application, along with more than eighty pages of medical records. At the applicant's request, the court ordered M.D.'s immediate detention under Iowa Code section 229.11, and a hearing was set on the application.

The day before the hearing, Dr. Vinodkumar Paddolkar—a psychiatrist at the medical center where M.D. was detained—filed a report with the court that recommended inpatient hospitalization. The report, which was admitted into evidence at the hearing, stated that M.D. was mentally ill, with diagnoses of "major depressive disorder, single, severe" and "psychotic disorder with hallucinations due to known physiological condition (seizure)." The report also stated that M.D. could not make responsible decisions about hospitalization or treatment. Finally, the report stated that M.D. was likely to physically injure herself or others because she "is placing herself in danger by pushing her wheelchair into middle of the road. Police and EMS had to . . . get her out of the situation."

Dr. Paddolkar was the only witness called by the State at the hospitalization hearing. *See* Iowa Code § 229.12(1) ("At the hospitalization hearing, evidence in

support of the contentions made in the application shall be presented by the county attorney."). The State did not offer the affidavit or the supporting medical records that were filed with the application into evidence. Dr. Paddolkar testified that he had been caring for M.D. since February, when she was "admitted because of agitated behavior." During that admission, Dr. Paddolkar learned that M.D. had suffered an anoxic brain injury several years ago that left her confined to a wheelchair and unable to speak, although she is "easily conversable" and "understands what we are asking." She also experiences seizures and myoclonus "where her body shakes." As a result, Dr. Paddolkar said that M.D. "lives in a site home run by Quad Cities Provider Services."

When asked what prompted M.D.'s admission to the hospital in June, Dr. Paddolkar responded that her "staff members wrote . . . the patient has not been doing good, non-compliant with medications, not sleeping, not taking her medications, and they appear to [believe] she is danger to self." He determined that M.D. was likely to physically injure herself or others because the site home documented that she "tried to go into the middle of the road into traffic in her wheelchair and it was reported that police and the ambulance . . . had to be involved to bring her back." On cross-examination, Dr. Paddolkar testified that during M.D.'s hospitalization, she was not aggressive or violent, and she was compliant with her medications.

M.D. testified at the hearing by nodding her head yes or no in response to leading questions from her attorney. The court intermittently confirmed M.D.'s responses on the record. When asked about being in the road in her wheelchair, the court noted that M.D. agreed with her attorney that she was trying to talk to

staff members who "were in an SUV on the road."  She agreed there was a sidewalk next to the vehicle, but it was too bumpy to travel on with her wheelchair. She also agreed this happened during the day, and the road was not busy.  M.D. shook her head "no" when asked whether she intended to harm herself or others by going onto the road, though she acknowledged it was "risky behavior" that she would not do again.

On further cross-examination after M.D.'s testimony, Dr. Paddolkar maintained that with M.D.'s medical issues, "she really took a big risk on herself because she has to be one-to-one all the time" and is a "high risk to fall."  He continued:

> So if she has taken the decision, you know, to go onto the road, to talk to the staff, which can be done in a totally different way— I do not know exactly the, you know, facts, the whole incident, but I feel like [M.D.] took a wrong decision to . . . wheel herself . . . onto the road, putting herself in danger and for other people, too, who are going on the road.

At the end of the hearing, the district court granted the application on the record, telling M.D.:

> [I]t's just the fact that you're in a wheelchair makes you very vulnerable and an incident like this where it may not be a big deal for some people, for you being in the street and potentially in traffic, even if you're not intend[ing] to cause harm to yourself, that very reasonably could be the result.

The court's written order simply stated: "The court finds clear and convincing evidence establishes Respondent is seriously mentally impaired" and in need of "[f]ull-time custody, care and treatment in a hospital."  M.D. appeals.

## II.     Standard of Review

Challenges to the sufficiency of the evidence in involuntary commitment proceedings are reviewed for errors at law. *In re V.H.*, 996 N.W.2d 530, 536 (Iowa 2023). "The allegations made in an application for involuntary commitment must be proven by clear and convincing evidence." *In re B.B.*, 826 N.W.2d 425, 428 (Iowa 2013). "Clear and convincing evidence" means that "there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *Id.* (citation omitted). The district court's findings of fact "are binding on us if supported by substantial evidence." *V.H.*, 996 N.W.2d at 536 (citation omitted).

## III.     Analysis

A person who has a "serious mental impairment" may be committed involuntarily "for a complete psychiatric evaluation and appropriate treatment." Iowa Code § 229.13(1). The definition of serious mental impairment in section 229.1(22) has three elements. *See V.H.*, 996 N.W.2d at 543. The respondent must be found to (1) have a mental illness; and, because of that illness, (2) lack sufficient judgment to make responsible decisions with respect to hospitalization or treatment, and (3) meet any of the following four grounds:

> a.  Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment.
> b.  Is likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the person with mental illness if the person with mental illness is allowed to remain at liberty without treatment.
> c.  Is unable to satisfy the person's needs for nourishment, clothing, essential medical care, or shelter so that it is likely that the person will suffer physical injury, physical debilitation, or death.
> d.  Has a history of lack of compliance with treatment and any of the following applies:

> (1) Lack of compliance has been a significant factor in the need for emergency hospitalization.
> (2) Lack of compliance has resulted in one or more acts causing serious physical injury to the person's self or others or an attempt to physically injure the person's self or others.

Iowa Code § 229.1(22). The third element is known as the "endangerment element," *V.H.*, 996 N.W.2d at 543, which we have said is necessary to justify the significant deprivation of personal liberty that results from a civil commitment, *In re L.E.B.*, No. 14-0989, 2015 WL 7575399, at *2 (Iowa Ct. App. Nov. 25, 2015).

The only ground of endangerment cited in the physician's report was the first—that M.D. was likely to physically injure herself or others without treatment.[1] And that is the sole issue raised by M.D. on appeal. She argues the "mere act of going into the street in a wheelchair without any harmful intent, threats, or physical aggression is not enough to make a predictive judgment by clear and convincing evidence that an individual is dangerous." In response, the State relies on other events described in the affidavit and medical records submitted with the committal application. But, as M.D. correctly points out, the State did not offer those documents into evidence at the hearing. *See* Iowa Code § 229.12(3)(a) ("The court shall receive all relevant and material evidence *which may be offered* and need not be bound by the rules of evidence." (emphasis added)). And neither the applicant nor the affiant testified at the hearing. *See In re L.M.*, No. 19-0936, 2020

---

[1] Invoking the fourth ground of endangerment on appeal, the State contends the evidence also established "a lack of compliance with treatment." But Dr. Paddolkar checked "no" next to that ground on the physician's report. And while he testified that M.D. was "non-compliant" with some appointments and a medication, Dr. Paddolkar did not testify that lack of compliance was "a significant factor in the need for emergency hospitalization" or that it "resulted in one or more acts causing serious physical injury to the person's self or others or an attempt to physically injure the person's self or others," as required by section 229.1(22)(d).

WL 1310354, at *4 (Iowa Ct. App. Mar. 18, 2020) (disregarding statements in an application and affidavit submitted by the respondent's parents about the respondent's suicidal statements where neither parent testified at the hearing); *see also* Iowa Code § 229.12(1) (stating the respondent "shall be afforded an opportunity to testify and to present *and cross-examine witnesses*" (emphasis added)); *In re T.S.*, 705 N.W.2d 498, 502 (Iowa 2005) ("Because a person's liberty interests are at stake, it is imperative that the statutory requirements and procedures of the involuntary commitment statutes be followed." (cleaned up)).

Confining our review to the evidence presented at the hearing, we conclude the court's finding of serious mental impairment was not supported by substantial evidence. The endangerment element "requires the threat the patient poses to himself or another be evidenced by a recent overt act, attempt, or threat." *V.H.*, 996 N.W.2d at 543 (cleaned up). "The element requires a predictive judgment, based on prior manifestations but nevertheless ultimately grounded on future rather than past danger." *Id.* (citation omitted). "Behavior that is socially unacceptable, standing alone, does not satisfy the overt act requirement." *L.E.B.*, 2015 WL 7575399, at *3 (citing *In re Mohr*, 383 N.W.2d 539, 542 (Iowa 1986)). Instead, the "'overt act' must indicate 'past aggressive behavior or threats' that manifest 'the probable commission of a dangerous act' by the respondent 'that is likely to result in physical injury.'" *V.H.*, 996 N.W.2d at 544 (quoting *In re Foster*, 426 N.W.2d 374, 378 (Iowa 1988)). "Stringent proof under the dangerousness standard is necessary because predicting dangerousness is difficult and, at best, speculative." *Foster*, 426 N.W.2d at 377–78. The proof offered here did not meet that standard.

We agree with M.D. that there was no evidence of past aggressive behavior or threats to harm herself or others. *See id.* at 378–79 (rejecting an applicant's "argument that the overt act itself need not necessarily involve a threat or an act of unprovoked aggression"). Instead, the only overt act identified by Dr. Paddolkar was M.D. "going into the road in her wheelchair," although he also testified that M.D. "has refused to go for her appointments, she refused one of the psychiatric medications . . . and there were also other incidents, getting, you know, naked . . . coming out of the room." But he didn't state when any of those incidents—including the one involving the wheelchair in the road—occurred or offer more details about them. *See In re A.P.*, No. 05-1893, 2006 WL 1896349, at *3 (Iowa Ct. App. July 12, 2006) (finding insufficient evidence of dangerousness where the witness could not identify when the respondent made suicidal statements or "made a U-turn in front of oncoming traffic"). And while Dr. Paddolkar testified that M.D. was hospitalized in February 2024 with "agitated behavior," he did not describe what that behavior entailed.

Although we understand the concerns for M.D.'s safety, the evidence presented at the hearing was too vague and speculative to provide clear and convincing evidence of dangerousness. *See In re Blaise*, No. 07-0188, 2009 WL 1066767, at *7 (Iowa Ct. App. Apr. 22, 2009) ("Where the significant deprivation of a person's liberty is at stake, as here, we think it is more prudent to err on the side of caution."). We accordingly reverse the district court's order finding M.D. seriously mentally impaired and involuntarily committing her for

treatment.  The case is remanded to the court with directions to terminate M.D.'s commitment.  *See Foster*, 426 N.W.2d at 380.

**REVERSED AND REMANDED WITH DIRECTIONS.**