**STATE of Iowa, Appellee**

v.

**Loren Glenn HUSS, Jr., Appellant.**

**No. 02–0427.**

Supreme Court of Iowa.

July 16, 2003.

---

John B. Whiston, University of Iowa Clinical Law Programs, and Stefanie Bowers and Jocelyn Prewitt, Student Legal Interns, Iowa City, for appellant.

Thomas J. Miller, Attorney General, Roxann M. Ryan and Thomas H. Miller, Assistant Attorneys General, and John P. Sarcone, Polk County Attorney, for appellee.

NEUMAN, Justice.

After seventeen years of legal wrangling in the state and federal courts, Loren Huss was found not guilty by reason of insanity for the murder of his girlfriend, Marilyn Sheets. We recently affirmed that verdict on appeal. *State v. Huss,* 657 N.W.2d 447, 454 (Iowa 2003). Huss now appeals the district court's order for his continued commitment pursuant to Iowa Rule of Criminal Procedure 2.22(8) (2001). The court concluded that Huss remains mentally ill and dangerous despite a written evaluation by a staff psychiatrist at the Iowa Medical and Classification Center (IMCC) that Huss "has no signs or symptoms of mental illness ... and is not seen as a danger to himself or others."

Because we are convinced the record supports the court's finding that Huss is still mentally ill, but the same record provides insufficient proof of present dangerousness, we reverse and remand with directions.

## I. Background Facts and Proceedings.

It is not the facts—but the inferences to be drawn from them—that are at the heart of this controversy. Huss argues strenuously that the district court erroneously focused on his past, "ignoring his entire recent record." One of the court's crucial tasks, however, was to make a predictive judgment about Huss's future behavior based on his prior conduct. *In re J.P.,* 574 N.W.2d 340, 344 (Iowa 1998); *In re Mohr,* 383 N.W.2d 539, 542 (Iowa 1986).

By any measure, much of Huss's prior conduct is horrifying. The following two paragraphs from the district court's ruling accurately summarize the assault wrought by an insane Huss on Marilyn Sheets:

In the early hours of May 19, 1986, Des Moines police responded to a domestic disturbance at the apartment of Defendant and Ms. Sheets. The apartment was virtually demolished. Broken furniture was strewn about. The walls were smeared with blood and peppered with holes. Defendant, soaked in his victim's blood, was yelling scripture and kicking and pouncing on the nude, spread-eagled body of Ms. Sheets when police arrived. It took five officers to subdue Defendant, who continued to chant variations of the verse from John 3:16.

Ms. Sheets had been struck, kicked, bitten, and strangled. She suffered a lacerated liver, bite marks of the head and neck, a crushed upper and lower jaw, and a brain hemorrhage in addition to the numerous contusions, lacerations and abrasions of the body, face, and throat. Dirt was found in her vagina which Defendant had repeatedly kicked. He had bitten off her nose and gouged out her eyes. He had scooped blood from the sockets and smeared it over the doorway in some reference to Passover. These injuries were inflicted antemortem.

Two other assaults, also shocking, predated Huss's attack on Sheets. In 1981, Huss—then eighteen years old—received a suspended sentence for second-degree robbery after committing a brutal, late-night assault on a woman in a parking lot. The victim was found unconscious, her clothes torn from her body, with multiple wounds including severe injuries to her eyes. A year later, Huss and several companions gang-raped a teenage girl. Huss, who was arrested at the scene, pleaded guilty to third-degree sex abuse. His prior probation was revoked and his ten-year sentence ordered to be served concurrently with his robbery conviction. It was while on parole for these convictions that he murdered Marilyn Sheets.

According to psychiatric experts who examined Huss following the Sheets murder, Huss's pre- and post-assault behaviors were symptomatic of the onset and culmination of bipolar affective disorder in manic phase: Huss had tried out for the Iowa Cubs, envisioning himself as a major league baseball player; he planned a gambling trip to Las Vegas as a way of earning money to feed Des Moines' homeless; his thinking and speech patterns were disorganized and marked by hyperreligiosity and hypersexuality; and he was dehydrated and weak after the killing. Based on the prior assaults, Huss was also diagnosed with an Axis II antisocial personality disorder.

By the end of 1986, Huss's bipolar condition had gone into remission. The State and defense counsel agreed Huss was insane at the time of the Sheets murder but Judge Jack Levin, who heard the matter on a stipulated record, disagreed and set the case for jury trial. *See State v. Huss,* 430 N.W.2d 621, 623 (Iowa 1988). We upheld Huss's subsequent murder conviction on appeal, *see id.* at 625, but—thirteen years later—the United States Court of Appeals for the Eighth Circuit, ruling on Huss's habeas corpus petition, ordered his release unless, within ninety days, the Iowa court rendered a verdict on the original stipulated record. *Huss v. Graves,* 252 F.3d 952, 958 (8th Cir.2001). As noted at the outset of this opinion, the state court adjudication that followed resulted in a verdict of not guilty by reason of insanity. *Huss,* 657 N.W.2d at 449. We upheld that verdict on appeal, *see id.* at 454, and the record made in connection with the post-verdict proceedings is now before us.

Two psychiatrists and one psychologist testified at the hearing on Huss's "present mental condition." *See* Iowa R.Crim. P. 2.22(8)(b). Dr. Michael Taylor, who twice evaluated Huss in 1986, explained that bipolar affective disorder is a genetically-based neurochemical disorder of the central nervous system characterized by at least one episode of mania and one or more episodes of depression. The illness is, by definition, episodic and, statistically speaking, is likely to last five weeks. Between episodes of mania or depression, the patient is, in Dr. Taylor's words, "completely asymptomatic, completely normal." When asked whether a medical expert could predict with accuracy when future psychotic episodes might occur in an individual with bipolar affective disorder, the doctor replied:

> If we have an individual who has had a manic episode every spring for the last eight years, it becomes relatively easy. But in an individual such as Mr. Huss who experienced what sounded to be his first manic episode in 1986, it is totally impossible to predict if or when Mr. Huss might experience a future manic episode or episode of depression.

As for a current diagnosis, Dr. Taylor testified Huss has bipolar affective disorder, in remission, along with an antisocial personality disorder. He made plain that mental illness in remission is not the same as the absence of mental illness, as the patient is at a "significantly greater risk than the general population" to experience a future manic episode. In his expert opinion, Huss continues to be dangerous because, in Dr. Taylor's words, "[t]he best predictor of future behavior is past behavior." He acknowledged that he knows of no treatment that would be helpful to Huss.

Dr. Curtis Fredrickson, staff psychiatrist at IMCC since 1979, has been acquainted with Huss since 1983. Huss worked as an aide on the psychiatric unit while awaiting discharge from prison in 1984 for his assault conviction. Then, in 1987, Fredrickson performed Huss's com-

petency evaluation in connection with the Sheets murder trial. His current diagnosis (which essentially mirrors the diagnosis given in 1987) is bipolar disorder, in remission, with one manic episode with psychotic features in 1986.

Dr. Fredrickson's written evaluation, which formed the basis for the rule 2.22(8) hearing that followed, reported this summary:

> [W]e are dealing with an individual of average intelligence with good academic abilities. He does not suffer from any major Axis I disorder at this time. He has not been on any psychiatric medications for 13½ years. His adjustment to the Department of Corrections has been good and he has been in general population with no difficulties.
>
> *TREATMENT/EVALUATION:*
>
> The patient has not required any treatment on this admission. He was involved in our routine program. Besides the unit milieu he was involved in some group therapy sessions, activities, social rec., and physical recreation activities, and individual counseling as needed. He had a job assignment along with the other patients helping clean the unit once a day.
>
> *CLINICAL COURSE:*
>
> No signs or symptoms of mental illness or psychosis or mania were noted.
>
> * * * *
>
> [C]urrently the patient . . . is not seen as a danger to himself or others.

Dr. Leonard Welsh, a psychologist with IMCC, diagnosed Huss with Axis I polysubstance abuse history and Axis II antisocial personality disorder. Welsh testified that he could not rule out Axis I psychosis or bipolar disorder in remission but had not personally observed the symptoms in Huss. When asked whether Huss presently posed a danger to himself or others, Welsh stated that "in terms of his profile you'd have to say that he is certainly more of a danger to others than the average citizen because the best predictor of future behavior is past behavior."

The court also heard brief testimony from Dorothy Wallace, the victim of Huss's first assault, and from Huss himself. Huss described, as best he could, the events surrounding Marilyn Sheets' death. Mindful that he was, at that time, totally out of control of his senses, he expressed concern over the potential for recurrence of that mental state. He explained that he has told his family and "friends in prison . . . everybody" that he expects them to take action if he ever begins displaying such "bizarre" behavior again. After describing how he has managed over the past fifteen years to coexist peacefully with inmates, correctional officers and others in a prison setting, he acknowledged his willingness to accept a conditional release, summing up by saying "I'm not trying to rattle society. I—I would do everything that the Court ordered just so everyone is safe, yes."

Further facts will be detailed as they relate to the issues on appeal.

## II. Scope of Review.

■ A threshold question concerns the scope of our appellate review which, of course, turns on the nature of the case on review. *Matter of Oseing*, 296 N.W.2d 797, 800 (Iowa 1980). Neither the requisite burden nor the standard of proof are mentioned in the governing procedural rule, Iowa Rule of Criminal Procedure 2.22(8).[1] The district court, bearing in

---

1. The rule states, in pertinent part:

b. *Commitment for evaluation.* Upon a verdict of not guilty by reason of insanity or

mind the liberty interest at stake and likening the case to a civil commitment proceeding, placed the burden on the State to prove by clear and convincing evidence that Huss is mentally ill and dangerous. *See Addington v. Texas,* 441 U.S. 418, 426–27, 99 S.Ct. 1804, 1810, 60 L.Ed.2d 323, 332 (1979) (constitution requires proof by clear and convincing evidence before state may civilly commit). The State counters that the burden of proof (by a preponderance of the evidence) properly rests on the defendant, "who has been found beyond a reasonable doubt to have committed the criminal acts, and who has carried his affirmative burden by a preponderance of the evidence to show that he is insane."

It is true, as the State contends, that the Supreme Court has upheld the constitutionality of a Washington, D.C., statute that placed the burden on the insanity acquittee to prove by a preponderance that he was no longer mentally ill and no longer a danger to himself or others. *Jones v. United States,* 463 U.S. 354, 368, 103 S.Ct. 3043, 3051, 77 L.Ed.2d 694, 707 (1983). The question is whether our legislature

intended the same, or a different, standard here. Each party cites cases and statutes from other jurisdictions to support their respective positions. While a review of such schemes is interesting, we find it largely unhelpful, except to note our legislature's wholesale failure to provide any guidance on the topic. *Compare* Iowa R.Crim. P. 2.22(8), *with* A.R.S. § 13–3994(C) ("If a person seeking release from confinement ... proves by clear and convincing evidence that he is ... no longer suffering from the mental disease or defect ... the person shall be released." (quoted in *State v. Johnson,* 156 Ariz. 464, 753 P.2d 154, 156 (1988))), *and* 730 ILCS 5/5–2–4(g) (West 1996) ("The findings of the court shall be established by clear and convincing evidence. The burden of proof and the burden of going forth with the evidence rest with the State when a hearing is held to review the determination of the facility director ...." (quoted in *People v. Grant,* 295 Ill.App.3d 750, 230 Ill.Dec. 129, 692 N.E.2d 1295, 1299 (1998))), *and* Neb.Rev. Stat. § 29–3702(2) ("If the court does not

diminished responsibility, the court shall immediately order the defendant committed to a state mental health institute or other appropriate facility for a complete psychiatric evaluation and shall set a date for a hearing to inquire into the defendant's present mental condition.... The chief medical officer shall report to the court within 15 days of the admission of the defendant to the facility, stating the chief medical officer's diagnosis and opinion as to whether the defendant is mentally ill and dangerous to the defendant's self or to others....
\* \* \* \*
e. Hearing; release or retention in custody. If, upon hearing, the court finds that the defendant is not mentally ill and no longer dangerous to the defendant's self or to others, the court shall order the defendant released. If, however, the court finds that the defendant is mentally ill and dangerous to the defendant's self or to others, the court shall order the defendant committed to a state mental health institute or to

the Iowa security and medical facility and retained in custody until the court finds that the defendant is no longer mentally ill and dangerous to the defendant's self or to others. The court shall give due consideration to the chief medical officer's findings and opinion along with any other relevant evidence that may be submitted.... [Within 30 days, and every 60 days thereafter, the chief medical officer shall report the defendant's condition and prognosis to the court.] If the chief medical officer reports at any time that the defendant is no longer mentally ill and is no longer dangerous to the defendant's self or to others, the court shall, upon hearing, order the release of the defendant unless the court finds that continued custody and treatment are necessary to protect the safety of the defendant's self or others in which case the court shall order the defendant committed to the Iowa security and medical facility for further evaluation, treatment, and custody.
Iowa. R.Crim. P. 2.22(8).

find that there is clear and convincing evidence of [omissions, threats, or overt acts indicative of dangerousness] the court shall unconditionally release the person from further court-ordered treatment." (cited in *Tulloch v. Nebraska*, 237 Neb. 138, 465 N.W.2d 448, 452 (1991))).

■ Huss concedes a presumption of insanity attends a verdict of acquittal on that ground and continues until the contrary is shown. *State v. Allan*, 166 N.W.2d 752, 758 (Iowa 1969). But, as he rightly notes, the presumption is by no means conclusive and, in fact, this court has found the presumption ends when the director of a medical facility notifies penal authorities that the defendant's sanity has been restored. *State v. Snethen*, 245 N.W.2d 308, 311 (Iowa 1976). That is essentially the situation before us. All agree the situation is uniquely complicated—and potentially clouded—by the sixteen-year delay between the occurrence of the insane act and the report (and subsequent hearing) on the defendant's mental fitness. The circumstance is much more akin to the sixty-day periodic review contemplated by rule 2.22(8)(e) than the initial evaluation and hearing ordered "immediately" upon a verdict of not guilty by reason of insanity in the ordinary case. *See* Iowa R.Crim. P. 2.22(8)(b).

■ Thus we hold, as did the district court, that once the IMCC report indicated Huss was no longer mentally ill and dangerous, the burden shifted to the State to prove the contrary, by clear and convincing evidence, to justify retaining him in custody. This is consistent with the burden resting on the applicant in a chapter 229 involuntary civil commitment. *See* Iowa Code § 229.12(3) (2001); *In re J.P.*, 574 N.W.2d at 342; *In re Foster*, 426 N.W.2d 374, 376 (Iowa 1988). It is consistent with the even heavier burden imposed by the legislature upon the State in con-

nection with the commitment and discharge of persons alleged to be sexually violent predators. *See* Iowa Code § 229A.7, .10 (burden upon state to prove statutory elements beyond a reasonable doubt); *In re Detention of Williams*, 628 N.W.2d 447, 458–59 (Iowa 2001). Such a standard plainly meets constitutional muster. *See Jones*, 463 U.S. at 368; 103 S.Ct. at 3051, 77 L.Ed.2d at 707. The district court was correct in so ruling.

■ That brings us back to the question of our appellate review. Huss has no quarrel with the constitutionality of rule 2.22(8). He merely challenges the sufficiency of the record to sustain the court's mandate under it. Proper application of the rule has constitutional implications, given the liberty interest at stake. *See State v. Stark*, 550 N.W.2d 467, 469 (Iowa 1996) (due process is violated if state confines harmless, mentally ill person). But we conclude that, as in the case of a civil commitment, our appellate review is limited to the correction of errors at law, not de novo. *See Oseing*, 296 N.W.2d at 800–01 (because commitment proceeding a special action triable as ordinary action, review on appeal is at law, not de novo); *accord In re Melodie L.*, 591 N.W.2d 4, 6 (Iowa 1999); *see also Allan*, 166 N.W.2d at 758 (appellate review under predecessor statute for trial of insanity acquittee reviewed at law, not de novo). Thus the district court's fact findings have the effect of a special verdict. *Oseing*, 296 N.W.2d at 801. In this context that means "[w]e will not set aside the trial court's findings unless, as a matter of law, the findings are not supported by clear and convincing evidence." *In re J.P.*, 574 N.W.2d at 342.

### III. Issues on Appeal.

■ Both parties agree that, under Iowa Rule of Criminal Procedure 2.22(8)(e), the court must "order the defendant released" unless the court finds the

defendant is *both* (1) mentally ill *and* (2) dangerous to himself or others. *Accord Stark*, 550 N.W.2d at 469. The question on appeal is whether the court erred in finding the State proved both elements by the requisite quantum of proof. To meet the clear and convincing standard applicable here, the evidence must leave " 'no serious or substantial doubt about the correctness of the conclusion drawn from it.' " *In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002) (quoting *Raim v. Stancel*, 339 N.W.2d 621, 624 (Iowa Ct.App.1983)).

Huss contests the court's findings on two grounds. He claims, first, the court "erred in concluding that mental illness in remission is the same as mental illness." Second, he challenges the court's finding on the issue of dangerousness, focusing on the record's lack of proof regarding a "recent overt act, attempt, or threat." We shall consider the arguments in turn.

■ *A. Mental Illness.* Although Huss vigorously contests the court's finding that he is presently mentally ill, his argument cannot withstand close scrutiny. All of the mental health experts who testified agreed that mental illness in remission is not the same as absence of mental illness. Other courts addressing the question have concluded that a person whose mental disorder is in remission is still mentally ill. *Johnson*, 753 P.2d at 157; *Green v. Comm'r of Mental Health and Mental Retardation*, 750 A.2d 1265, 1275 (Me. 2000); *see also State v. Simants*, 245 Neb. 925, 517 N.W.2d 361, 367 (1994) (schizophrenia in remission due to highly structured setting, not lack of mental illness); *In re Hayes*, 151 N.C.App. 27, 564 S.E.2d 305, 313 (2002) (although asymptomatic, insanity acquittee being treated for schizophreniform disorder still suffers from mental illness).

Because Huss presently displays no symptoms of his disorder, and is receiving no treatment for it, he claims his situation is "radically different" from the cases just cited. He also argues that a finding to the contrary under this record would "condemn a person who was formerly mentally ill to a lifetime in prison." Such a fate, Huss argues, contravenes the holding of *Foucha v. Louisiana*, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). We disagree. In *Foucha*, the Supreme Court struck down a statutory scheme that permitted Louisiana to confine those found not guilty by reason of insanity without any proof of continuing mental illness. *Foucha*, 504 U.S. at 78–80, 112 S.Ct. at 1784–86, 118 L.Ed.2d at 446–49. Plainly the governing Iowa rule—which requires a finding of both mental illness and dangerousness—does not suffer the Louisiana statute's constitutional flaws.

Moreover, the factual record made before the district court more than adequately supports the court's conclusion that Huss, despite being asymptomatic, still suffers from bipolar disorder. By its very nature, the disease is episodic and recurrent. The record reveals that ninety percent of individuals who, like Huss, experience a single manic episode will suffer a repeat episode in the future. *Accord* American Psychiatric Association, *Diagnostic and Statistical Manual IV* at 353 (4th ed. 1990) (hereinafter DSM–IV); *see generally* Paul E. Keck, Jr., *Long-term Therapy of Bipolar Illness*, The Journal of Family Practice, March 2003 Supp., at 18 (describing long-term therapies for bipolar disorder, "a persistent, severe, sometimes lethal, and lifelong illness"). In short, the record supports, by clear and convincing proof, the district court's finding that Huss is mentally ill, even though that illness appears to be in remission.

■ *B. Dangerousness.* That brings us to the tougher issue on appeal— whether the record supports the district

court's conclusion that Huss continues to present a danger to himself or others. Huss concedes, as he must, that prior criminal conduct is relevant and probative on the point. *Stark,* 550 N.W.2d at 469–70. As the Supreme Court observed in *Jones,* "The fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness." *Jones,* 463 U.S. at 364, 103 S.Ct. at 3049, 77 L.Ed.2d at 705. The question is whether the court accorded undue weight to Huss's history here, given the unrefuted evidence that he has been free of any symptoms of mental illness and a model prisoner for sixteen years.

▆▆▆▆ The State urged in the trial court, and argues on appeal, that the court should regard dangerousness in the criminal context differently from the question of dangerousness in the civil context. Our cases do not support this distinction. "The purpose of commitment following an insanity acquittal *like that of a civil commitment* is to treat the individuals' mental illness and protect them and society from their potential dangerousness." *Stark,* 550 N.W.2d at 469 (emphasis added). Continued confinement can only be justified on the basis of continuing dangerousness. *Id.* Without this limit, dangerousness could easily become a surrogate for punishment. *See Foucha,* 504 U.S. at 80, 112 S.Ct. at 1785, 118 L.Ed.2d at 448 (as defendant "was not convicted, he may not be punished"); *Stark,* 550 N.W.2d at 469 (insane person acquitted of criminal conduct may not be punished).

To meet constitutional muster in the civil commitment context, we have long held the dangerousness element "requires that the threat the patient poses to himself or others be evidenced by a 'recent overt act, attempt or threat.'" *Mohr,* 383 N.W.2d at 542 (quoting *Stamus v. Leon-*

*hardt,* 414 F.Supp. 439, 451 (S.D.Iowa 1976)); *accord In re Foster,* 426 N.W.2d at 377. We just recently affirmed this essential criterion for confinement in a case involving a prisoner alleged to be a sexually violent predator. *In re Detention of Gonzales,* 658 N.W.2d 102, 105 (Iowa 2003). In *Gonzales,* the prisoner's current confinement was not for a predatory offense but for operating a motor vehicle without the owner's consent. *Id.* at 102. Under the State's interpretation of section 229A.3(1) of our Sexually Violent Predator Act, it argued Gonzales' prior record of sexual abuse—combined with his current confinement for OMWOC—subjected him to commitment as a sexually violent predator irrespective of whether the State could show a "recent overt act." *Id.* at 104. We rejected the State's contention, and reversed the trial court's commitment order, noting such an interpretation of the statute "would raise serious constitutional issues." *Id.* at 105. We said:

> To confine a citizen against his will because he is likely to be dangerous in the future, it must be shown that he has actually been dangerous in the *recent* past and that such danger was manifested by an overt act, attempt or threat to do substantial harm to himself or to another.

*Id.* (quoting *Lynch v. Baxley,* 386 F.Supp. 378, 391 (M.D.Ala.1974)) (emphasis added).

▆▆▆ Requiring proof of a "recent overt act" in the criminal as well as civil commitment arena dovetails neatly with rule 2.22(8)(b)'s focus on the defendant's *"present mental condition."* (Emphasis added.) Proof of dangerousness calls for a predictive judgment based on past conduct but must be ultimately grounded on future, not past, danger. *In re J.P.,* 574 N.W.2d at 344. The New York Court of Appeal, seeking to define the word "currently" in a similar statutory scheme, re-

jected a strict reading of the word, reasoning that persons under state commitment "ordinarily pose little *current* risk to themselves or to others." *In re George L.*, 85 N.Y.2d 295, 624 N.Y.S.2d 99, 648 N.E.2d 475, 478 (1995). The court nevertheless observed that a finding of current dangerousness "must be based on more than expert speculation that [the insanity acquittee] poses a risk of relapse or reverting to violent behavior once medical treatment and supervision are discontinued." *Id.* at 481. It concluded that neither the nature of the insane acquittee's prior criminal act "nor the statistical probability of relapse, standing alone," were sufficient to establish "current dangerousness." *Id.* However, the defendant George L.'s history of relapse following release from commitment, combined with the fact that only seventeen *months* had elapsed since his latest criminal assault, prompted the New York court to affirm the lower court's commitment order. *Id.*

In stark contrast to the record before the New York Court of Appeals in *In re George L.*, the record before us reveals nearly seventeen *years*—rather than *months*—since Huss's most "recent overt act." The State counters that because "Huss has been in a controlled environment since 1986, recent acts are less relevant to the question of dangerousness." There are two reasons to give this argument little weight. First, expert testimony in this case—confirmed by one of our recent cases and others—demonstrates that even a structured environment like a prison will not prevent a person from having a psychotic episode or engaging in violent behavior. *See, e.g., State v. Polly*, 657 N.W.2d 462, 465 (Iowa 2003) (inmate assaulted prison nurse with intent to commit sexual abuse); *Greeno v. State*, 59 S.W.3d 500, 505 (Mo.2001) (evidence of verbal assaults during institutionalization supported finding of continued dangerousness); *In re Hayes*, 564 S.E.2d at 309 (assaults and ongoing conflicts during hospitalization supported finding of continued dangerousness). There is not a hint of such conduct, psychotic or otherwise, in the record before us.

Second, by focusing solely on a history of mental illness and resulting past conduct, to the exclusion of current evaluations and recent patterns of conduct over a course of years, the State renders pointless the review and assessment provisions of rule 2.22(8). Other courts have rightly rejected the perpetual confinement to which such analysis inevitably leads. *See, e.g., United States v. Bilyk*, 29 F.3d 459, 461 (8th Cir.1994) (using past history to defeat present diagnosis eliminates rationale for periodically evaluating insanity acquittee's mental status); *Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir.1993) (trial court's exclusive focus on evidence of past behavior erroneously amounted to irrebuttable presumption that petitioner could never be released); *see also State v. Sommerville*, 86 Wash.App. 700, 937 P.2d 1317, 1322 (1997) (defendant, who murdered wife and raped daughter while in psychotic state, exhibited no symptoms of mental illness during twelve year commitment and, accordingly, must be released).

We are not unsympathetic to the district court's expressed concern that Huss's history "portends a future fraught with danger to women" if he is released. Indeed, Huss himself appears to share the same concern over his troubled past and the unpredictability of his illness. But, as this court observed in *Stark*, "it is a violation of due process for a state to confine a harmless, mentally ill person." 550 N.W.2d at 469. By all accounts, Huss's mental disorder has been in remission for years. The record emphatically establishes that, despite a diagnosis of antisocial personality disorder, Huss has posed no harm to any-

one for seventeen years. He has gotten along well with others whether confined in the penitentiary or the mental hospital.

The nagging factual question is "Will he do it again?" But because we are judges, not oracles, we are obliged to fix our focus on the statutory and constitutional criteria guiding commitment decisions. In the absence of a finding by the district court that Huss has committed a recent overt act of substantial harm to himself or another, continued commitment under rule 2.22(8) can simply not be justified. *Gonzales*, 658 N.W.2d at 105. Accordingly, we reverse the judgment of the district court and remand for an order of discharge.

**REVERSED AND REMANDED.**