# IN THE COURT OF APPEALS OF IOWA

No. 19-0567
Filed February 19, 2020

**IN THE MATTER OF P.K.,**
**Alleged to Be Seriously Mentally Impaired,**

**P.K.,**
    Respondent-Appellant.
_____

    Appeal from the Iowa District Court for Johnson County, Sean W. McPartland, Judge.

    P.K. appeals from a judgment imposing an involuntary commitment. **AFFIRMED.**

    Jonathon Muñoz of Nidey, Erdahl, Fisher, Pilkington & Meier PLC, Cedar Rapids, for appellant.

    Thomas J. Miller, Attorney General, and Gretchen Kraemer, Assistant Attorney General, for appellee State.

    Considered by Tabor, P.J., and Mullins and Schumacher, JJ.

**SCHUMACHER, Judge.**

P.K., an inmate within the Iowa Department of Corrections (DOC), appeals from a district court decision finding him seriously mentally impaired and imposing involuntary commitment. He argues the State presented insufficient evidence to establish he lacks judgmental capacity to make decisions regarding treatment and that he posed a danger to himself or others. We find clear and convincing evidence in the record to support the district court's findings, and we therefore affirm.

**Procedural history**

P.K. has been in the custody of the DOC since June 2016. He is serving a fifty-year sentence for a murder conviction. P.K. concedes he has a diagnosis of Post-Traumatic Stress Disorder (PTSD) stemming from two tours of duty in Iraq. He has also been diagnosed with bipolar type schizoaffective disorder. P.K. began refusing psychiatric medications in September 2017. Following an increase in behavioral issues in 2017 and 2018, the State filed an application for civil commitment in late August 2018. That application was denied.

Further behavioral issues continued in the second half of 2018 and into January 2019. On January 3, 2019, P.K. was ordered to relocate to investigative segregation. He refused multiple orders to allow placement of restraints prior to the move. He "turned on staff." Additional staff responded to the situation, and P.K. resisted throughout the escort. Due to P.K.'s noncompliance during this move, he was taken to the ground and suffered injuries. P.K. reports those injuries as a broken nose, two black eyes, a contusion on his right shoulder, floor burns on his right elbow, an injury to his right hand, and upper back and neck pain.

On January 11, 2019, the State filed a new application for civil commitment and supporting evaluation reports. The hospitalization referee approved the application on January 16, and P.K. filed a notice of appeal on January 19. The district court held a hearing on February 19, 2019, and affirmed the referee's decision on February 27, ordering that P.K. continue to be treated at the Iowa Medical Classification Center. The district court found that "without hospitalization [P.K.] is a serious risk to injure himself or others," supporting that finding by highlighting P.K.'s injuries from the January 3 incident and his threats directed at staff. P.K. timely appealed from the district court's decision, arguing the State provided insufficient evidence to support the district court's findings.

**Standard of Review**

"We review challenges to the sufficiency of the evidence in involuntary commitment proceedings for errors at law." *In re B.B.*, 826 N.W.2d 425, 428 (Iowa 2013). A district court's findings of facts in a civil commitment proceeding have the effect of a special verdict. *State v. Huss*, 666 N.W.2d 152, 159 (Iowa 2003). "In prior decisions involving involuntary commitment we have said the elements of serious mental impairment must be established by clear and convincing evidence and the district court's findings of fact are binding on us if supported by substantial evidence." *In re J.P.*, 574 N.W.2d 340, 342 (Iowa 1998). "Clear and convincing evidence is evidence that leaves 'no serious or substantial doubt about the correctness of the conclusion drawn from it.'" *In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002) (quoting *Raim v. Stancel*, 339 N.W.2d 621, 624 (Iowa Ct. App. 1983)).

**Discussion**

A finding that a respondent is seriously mentally impaired within the meaning of Iowa Code section 229.1(20) (2019) requires proof of three elements. *J.P.*, 574 N.W.2d at 343. First, the respondent must have a mental illness. *Id.* Second, because of that illness the respondent must lack "sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment." Iowa Code § 229.1(20); *see J.P.*, 574 N.W.2d at 343. The third element is met when, because of their mental illness, the respondent meets any of the following criteria:

> a. Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment.
> b. Is likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the person with mental illness if the person with mental illness is allowed to remain at liberty without treatment.
> c. Is unable to satisfy the person's needs for nourishment, clothing, essential medical care, or shelter so that it is likely that the person will suffer physical injury, physical debilitation, or death.
> d. Has a history of lack of compliance with treatment and any of the following apply:
> > (1) Lack of compliance has been a significant factor in the need for emergency hospitalization.
> > (2) Lack of compliance has resulted in one or more acts of serious physical injury to the person's self or others or an attempt to physically injure the person's self or others.

Iowa Code § 229.1(20); *see J.P.*, 574 N.W.2d at 342–43.

P.K. concedes satisfaction of the "mental illness" element, acknowledging a diagnosis of PTSD. He disputes the trial court's findings under the second and third elements. The trial court found the third element satisfied under paragraphs (a) and (c).

## A. Lack of Sufficient Judgment

P.K. disputes the trial court's determination that he "lacks sufficient judgment to make responsible decisions concerning his hospitalization and treatment." In considering this second element, the critical inquiry is whether "the person is unable, because of the alleged mental illness, to make a rational decision about treatment, whether the decision is to seek treatment or not." *In re Oseing*, 296 N.W.2d 797, 801 (Iowa 1980) (quoting Randall Bezanson, *Involuntary Treatment of the Mentally Ill in Iowa: The 1975 Legislation*, 61 Iowa L. Rev. 261, 275 (1975)). The trial court made the following findings in support of this element:

> The facts before the Court indicate that [P.K.] has taken himself off medication and has become agitated, angry and threatening. Dr. Keller testified as to such matters as well. [P.K.] acknowledges having become upset with and threatened staff, but testified such conduct was caused by his medication. Dr. Keller testified [P.K.] could be and should be treated with medications, but has failed to take his medications.
> The Court believes that his mental illness has resulted in [P.K.'s] lacking sufficient judgment to make responsible decisions concerning his treatment and hospitalization. Accordingly, the Court finds that the State has proven by clear and convincing evidence that, because of his diagnosed conditions, [P.K.] lacks sufficient judgment to make responsible decisions concerning his hospitalization and treatment.

Based our review of the record, we find that clear and convincing evidence supports these findings.

P.K. argues his ongoing refusal of medication since September 2017 is "a rational decision given his complaints of headaches." He asks us not to "unfairly hold [his] rational decision regarding medication against him as pertains to the issue of judgmental capacity." He alleges that "the main concerns regarding his status are mere general concerns regarding his deteriorating state," and he

"argues that his ability to safely navigate the DOC since September 2017 without any need for a civil commitment supports his contention that he does have insight into his own mental health issues."

P.K. cites *J.P.*, 574 N.W.2d at 343, to support his argument that his refusal to take medication is rational and should not be considered as supporting the lack-of-sufficient-judgment element. However, the Iowa Supreme Court's finding in *J.P.* that a refusal to take medication was rational occurred on distinguishable facts. *See J.P.*, 574 N.W.2d at 341–42. In such case, the respondent had a bachelor's degree in psychology and a master's degree in counseling and psychology. *Id.* at 341. She voluntarily removed herself and her daughters from the family home and went to a shelter. *Id.* at 342. The father elicited information from the daughters about where they were staying with their mother, and the father subsequently filed an application alleging the mother was seriously mentally impaired. *Id.* The mother had previously been voluntarily hospitalized for depression and counseling. *Id.* at 341. After leaving the hospital, she chose to discontinue medication due to concerns about possible side effects. *Id.* at 342. Although the hospitalization referee and district court found her to be seriously mentally impaired, she appealed that determination, and the Iowa Supreme Court held "there was not clear and convincing evidence to support the district court's finding that [she] lacked the ability to make responsible decisions regarding her treatment." *Id.* at 342–43.

In stark contrast, P.K. has repeatedly violated the security protocols established for his protection and the protection of the workers and fellow inmates in his facility, has made threats, and has been aggressive with staff. We find *In re B.T.G.*, 784 N.W.2d 792, 794–95 (Iowa Ct. App. 2010), to be more instructive

based on the facts of the instant case. In that case, we highlighted the respondent's refusal to take medication as indicative of an inability to make rational decisions regarding treatment. *B.T.G.*, 784 N.W.2d at 798. *B.T.G.* was described as "out of control, is at a risk for self-harm, threatens to kill the staff and their children when not on his medications and also gets in fights with others at the facility." *Id.* at 797. There was testimony that, "Without this medication, his illness is not controlled. This is a chronic and persistent illness with ongoing psychosis with extreme mood swings from depression to threatening and violent behavior." *Id.* We concluded the "lacking sufficient judgment" element was satisfied by these findings of fact. *Id.* at 798.

As in *B.T.G.,* P.K. became "out of control" and "threatening" after his noncompliance with medication. The record evinces numerous threats made by P.K. to staff and violations of security protocols. P.K. began to cease scheduled medications in September 2017. Several weeks after discontinuing consistent medications, P.K. received a major disciplinary report for loitering around a secured gate area after several warnings. A similar instance recurred in December 2017. In 2018, P.K.'s mother raised concerns regarding P.K. after a phone call in which he made comments about killing someone and alleged government involvement.

In August 2018, P.K. was transferred to a new housing unit to test if he could transition to a lower level of security status, however he left that unit unescorted more than once for specious reasons. In September 2018, he resumed unescorted explorations of secured areas near gates. In October and November, he threatened a staff member, spat on his cell's window while an officer

passed, and attempted again to access unauthorized areas. Furthermore, he has made delusional comments, including identifying himself as Jesus to staff and by telling staff of a need to "murder Satan." He threatened to kill an individual during a phone call. These disturbing behaviors preceded the January 3, 2019 incident in which P.K. suffered injuries while being subdued due to noncompliance with orders to relocate. His treating doctor testified that P.K. has exhibited a "long but a slow deterioration in his functioning." His treating doctor also opined that he has observed a deterioration in mental health since P.K. stopped taking medication.

This evidence supports a finding that P.K "lacks sufficient judgment to make responsible decisions with respect to [his] hospitalization or treatment." Iowa Code § 229.1(20). His behaviors are not consonant with "a rational decision" concerning a refusal of medications to treat his mental illness. *See Oseing*, 296 N.W.2d at 801. We conclude clear and convincing evidence supports the trial court's finding that because of his illness P.K. lacks sufficient judgment to make responsible decisions with respect to his hospitalization or treatment.

## B. Dangerousness

We next consider the third element of a seriously-mentally-impaired finding under Iowa Code section 229.1(20). *B.T.G.*, 784 N.W.2d at 798. This element requires the State to show that, because of his mental illness, P.K. satisfies one of the dangerousness grounds in paragraphs (a)–(d) of Iowa Code section 229.1(20). The parties and the district court have analyzed P.K.'s dangerousness under paragraphs (a) and (c):

> a. Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment.
> . . .

      c. Is unable to satisfy the person's needs for nourishment, clothing, essential medical care, or shelter so that it is likely that the person will suffer physical injury, physical debilitation, or death.

Paragraph (c) is of limited applicability to a respondent who is incarcerated, in that an incarcerated person is provided "nourishment, clothing, essential medical care, [and] shelter" by the State. We observe that paragraph (d), while recently added to Iowa Code, was in force by the time these proceedings arose. *See* 2018 Iowa Acts ch. 1056, § 7. Paragraph (d) satisfies the dangerousness element if because of the person's mental illness the person:

> Has a history of lack of compliance with treatment and any of the following apply:
>     (1) Lack of compliance has been a significant factor in the need for emergency hospitalization.
>     (2) Lack of compliance has resulted in one or more acts of serious physical injury to the person's self or others or an attempt to physically injure the person's self or others.

Iowa Code § 229.1(20)(d).

      However, because clear and convincing evidence supports a finding of dangerousness under paragraph (a), we need not consider whether paragraph (c) is satisfied or the applicability of paragraph (d).

      Clear and convincing evidence in the record supports a finding that P.K. "is likely to physically injure . . . [him]self or others if allowed to remain at liberty[1] without treatment." Iowa Code 229.1(20)(a). The term "likely" in paragraph (a) means "probable or reasonably to be expected." *In re Foster*, 426 N.W.2d 374, 377 (Iowa 1988) (quoting *Oseing*, 296 N.W.2d at 801). The dangerousness element requires that the threat the patient poses to himself be evidenced by a

---

[1] We interpret "at liberty" to mean in the general population of the prison rather than the acute mental health unit.

"recent overt act, attempt or threat." *Huss*, 666 N.W.2d at 161 (quoting *In re Mohr*, 383 N.W.2d 539, 542 (Iowa 1986)). P.K. made threats to staff and repeatedly violated security protocols by venturing into prohibited areas. The State's evidence showed that P.K.'s violations increased in the months immediately prior to P.K.'s involuntary commitment. The evidence regarding the January 3, 2019 incident indicates that multiple staff were required to transfer P.K. from one unit to another and that P.K.'s aggression toward staff and noncompliance with orders on that occasion was the reason for the takedown that led to injuries.

P.K.'s actions can be distinguished from those of the respondent in *Foster*, 426 N.W.2d at 375. In that case, the respondent, also an inmate, only sporadically took medication for his chronic undifferentiated schizophrenia, which resulted in the respondent making bizarre and delusional statements. *Id.* at 375–76. While incarcerated, the respondent was involved in two altercations with fellow inmates but was not the aggressor in either fight. *Id.* at 375. The respondent's strange statements played some role in the altercations, however the Iowa Supreme Court held the overt-act requirement unsatisfied, saying, "[p]rovoking acts of aggression toward oneself by bizarre or socially unacceptable behavior does not elevate such behavior to a level of likely physical injury to oneself." *Id.* at 379. Because the respondent's statements did not satisfy the "overt act" requirement and the respondent was not the initial aggressor in the altercations, the court held the dangerousness element was not satisfied. *Id.* at 380–81 (remanding for termination of the involuntary commitment).

P.K. committed a major prison violation in January 2017 for assaulting a peer, and he received a minor report for punching and spitting at his cell door when officers were passing. P.K. was the aggressor in the January 3, 2019 incident, where his noncompliance led to his injuries. P.K.'s violations and injury were initiated by his own actions. We find *Foster* distinguishable and hold the overt-act requirement satisfied on these facts.

On appeal, P.K. dismisses the import of the January 3, 2019 incident because he did not engage in "active threatening behavior" and because the DOC generated no disciplinary reports related to the incident. However, he cites no authority for the proposition that "threatening" behavior is required to satisfy the overt-act requirement or is otherwise equivalent to "dangerousness," and he similarly fails to cite authority for his argument that an absence of a disciplinary report mitigates his actions or injury on January 3, 2019.

The absence of a disciplinary report related to the January 3 incident does not lessen the import of P.K.'s actions or injury on that date. Instead, we find P.K.'s noncompliance during the January 3, 2019 incident and his resulting injury to be the consequence of his own overt act. *See Huss*, 666 N.W.2d at 161 (requiring proof of a "recent overt act" to satisfy the dangerousness element in a civil commitment case).

Although on appeal P.K. characterizes the State's concerns as "mere general concerns regarding his deteriorating state," he does not contest the State's multiple assertions that P.K.'s condition is indeed deteriorating. Given P.K.'s injuries from the January 3, 2019 incident and the increasing number and severity of violations of security protocols, we find it probable or reasonably to be expected

that P.K. suffer another injury in the absence of civil commitment. We further find that the January 3, 2019 incident satisfies the requirement of *Huss* and *Mohr* for a "recent overt act."

Lastly, P.K. requests that our court not treat him differently under chapter 229 because he is incarcerated, asserting that "the necessary inquiry . . . is whether he would have been found to [be] seriously mentally impaired under Chapter 229 if he were . . . not an inmate in DOC custody." In our review of the record, we cannot divorce P.K.'s conduct from the setting in which it occurred. His environment must provide some context for our review.

The injury he sustained as a result of noncompliance with an order to relocate only occurred because he is incarcerated. We do not disregard this incident because P.K. was incarcerated during the incident. We have further not considered the fact of P.K.'s conviction and incarceration in isolation in our analysis under the dangerousness element of Iowa Code section 229.1. While P.K. argues on appeal that disobedience and failure to cooperate in an incarceration setting does not rise to the level of dangerousness that would implicate section 229.1(20)(a), his actions have already led to injuries and his behavior prior to commitment shows he is likely to physically injure himself or others.

**Conclusion**

A determination that an individual is "seriously mentally impaired" requires a showing of three elements. P.K. concedes the satisfaction of the first element, and the district court's findings as to the second and third elements are supported

by clear and convincing evidence.  Having rejected P.K.'s arguments on appeal, we affirm the district court's finding that P.K. is seriously mentally impaired.

**AFFIRMED.**