In the Matter of Gary MOHR, Alleged To Be Seriously Mentally Impaired, Appellant.

No. 85–249.

Supreme Court of Iowa.

March 19, 1986.

William D. Werger of Hayek, Hayek, Hayek & Holland, Iowa City, for appellant.

J. Patrick White, Co. Atty., and Anne M. Lahey, Asst. Co. Atty., for petitioner.

Considered by HARRIS, P.J., and LARSON, SCHULTZ, CARTER, and WOLLE, JJ.

HARRIS, Justice.

In this involuntary hospitalization proceeding under Iowa Code chapter 229 the district court found impairment and directed treatment. On appeal the court of appeals reversed. On further review we vacate the decision of the court of appeals and affirm the district court.

In January 1985 Gary Mohr voluntarily admitted himself to the Veteran's Administration Hospital in Iowa City for medical treatment. Mohr was diagnosed as suffering from a highly infectious form of pneumonia. He was initially treated with oral antibiotics.

Mohr was later treated with stronger antibiotics which were to be given intravenously. After the I.V. treatment began Mohr developed phlebitis, which we are told is a rather common side effect of I.V. treatment. Mohr then began refusing the treatment and also began exhibiting symptoms of a psychiatric disorder. A psychiatric consultation was ordered. Thereafter an application for involuntary hospitalization was filed under Iowa Code section 229.6 (1985).

Dr. Kurt Klauburg, the psychiatric resident who examined Mohr, testified Mohr claimed the hospital was holding women for "white slavery" purposes and that several staff persons had forcibly masturbated Mohr and other patients on several occasions. Mohr also told Dr. Klauburg the staff at the hospital "were all rapists and that [Mohr] would see them burn in hell."

Dr. Klauburg diagnosed Mohr as suffering from chronic undifferentiated schizophrenia. Dr. Klauburg provided the following definition of his diagnosis:

The term chronic refers to the course of the illness, in that the patient who has a chronic schizophrenia will go through exacerbation and remissions of the illness, usually brought on by some sort of threat ... that would include a physiologic stress such as an illness.

The undifferentiated term of schizophrenia ... is characterized by profound delusionary content. The delusionary thought processes are the main element of the schizophrenia.... [S]chizophrenia itself is characterized by ... bizarre delusions, also deterioration from the previous level of functioning....

Because Mohr was refusing antibiotic medications Dr. Klauburg instituted a hold order and transferred him to the psychiatric unit of the hospital:

He has consistently been quite hostile and uncooperative. He continued to refuse his medications when he was transferred and so at that time we instituted a hold order so that we could give him his antibiotics against his will.... [H]e had not fulfilled the full treatment of antibiotics and we felt if we were to discontinue it at a time he was transferred that he would be a danger to himself and that the pneumonia more than likely would return and that he would be a danger to other people, the other patients on the floor because he would again become contagious.

Dr. Klauburg also testified Mohr had been suffering from mental illness since 1972 and had been hospitalized many times. Mohr's past medical records disclosed some instances of verbal sexual overtures made to strangers and a 1972 assault in which he held a gun to his father's head, shot a gun over his father's head, and accused his father of murdering Mohr's mother.

Mohr was apparently given medication for his pneumonia by way of injection. Antipsychotic medication was also prescribed for him, although the record seems to indicate he refused it. Dr. Klauburg testified Mohr was withdrawn and seclusive in the psychiatric unit and it was "difficult for us to tell if his delusional thought content is there...." Dr. Klauburg indicated Mohr had never threatened staff or other patients while in the hospital. Mohr never mentioned suicide or harming himself.

Mohr also testified at the hearing. He stated he owned a trailer in Iowa City, had lived there for the past year without incident, and received $450 per month social security, his sole source of income. He

denied making any statements about "white slavery," but continued to maintain he was sexually abused by V.A. staff members. He denied telling Dr. Klauburg that other patients had been abused. He also made statements about his "father's Nazi connections in West Germany":

> It appeared that some of his family were used to throw bodies into furnaces. I gathered this from what he has told me. He knows too much about it for an average citizen. In fact, it wasn't the Jews that were killed, it was Polish and Czechoslovakian technicians lured to factories for work.

Mohr contended he was "quite mentally healthy" and denied any need for treatment.

The trial court found Mohr to be "seriously mentally impaired" and lacking "sufficient judgment to make responsible decisions with respect to his hospitalization and treatment. Furthermore, he is likely to physically injure himself or others if allowed to remain at liberty without treatment." As a result the court ordered Mohr to remain in the V.A. hospital "for complete psychiatric evaluation and appropriate treatment."

■ I. An involuntary civil commitment proceeding is a special action which is triable to the court. *Matter of Oseing*, 296 N.W.2d 797, 800–801 (Iowa 1980). The district court's findings of fact have the effect of a special verdict and will be upheld if there is substantial evidence to support them. *Id.*

■ Commitment is not warranted unless the elements set forth in Iowa Code section 229.1(2) (1985) are proven by clear and convincing evidence. Iowa Code section 229.12(3). *See also Addington v. Texas*, 441 U.S. 418, 433, 99 S.Ct. 1804, 1813, 60 L.Ed.2d 323, 335 (1979).

Iowa Code section 229.1(2) provides the following definition of "serious mental impairment":

> "*Seriously mentally impaired*" or "*serious mental impairment*" describes the condition of a person who is afflicted with mental illness and because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment, and who:
>
> a. Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment; or
>
> b. Is likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the afflicted person if the afflicted person is allowed to remain at liberty without treatment.

In *Oseing*, we held this definition contains three express elements:

> The respondent must be found to be (1) "afflicted with a mental illness," consequently (2) to lack "sufficient judgment to make responsible decisions with respect to his or her hospitalization or treatment," and (3) to be likely, if allowed to remain at liberty, to inflict physical injury on himself or others or to inflict emotional injury on the designated class of persons.

296 N.W.2d at 799.

It is not disputed that Mohr is mentally ill. The first *Oseing* element is satisfied.

■ II. The second *Oseing* element "requires the State to prove 'that the person is unable, because of the alleged mental illness, to make a rational decision about treatment, whether the decision is to seek treatment or not.'" 296 N.W.2d at 801 (quoting Bezanson, *Involuntary Treatment of the Mentally Ill in Iowa: The 1975 Legislation*, 61 Iowa L.Rev. 261, 275 (1975)). We agree, as did the court of appeals, with the district court's finding that Mohr lacked judgment to make a "rational decision" about his treatment. Mohr denied his need for treatment, stating that "I really don't feel I need any help."

Such a denial, in the face of a conclusive showing that he has a serious need for help, is a significant indication of his inability to make a rational decision about treatment. *Oseing*, 296 N.W.2d at 801. There is also medical evidence which amply sup-

ports the district court's finding on the second *Oseing* element.

III. The closest question in the case is over the third *Oseing* element, the district court's finding that Mohr is "likely, if allowed to remain at liberty, to inflict physical injury on himself or others." In *Oseing* we construed "likely" to mean "probable or reasonably to be expected." *Id.* We also noted that the endangerment element "requires a predictive judgment, 'based on prior manifestations but nevertheless ultimately grounded on future rather than past danger.'" *Id.* (quoting Bezanson, *supra,* at 304).

This element requires that the threat the patient poses to himself or others be evidenced by a "recent overt act, attempt or threat." *Stamus v. Leonhardt,* 414 F.Supp. 439, 451 (S.D.Iowa 1976); *see also Project Release v. Prevost,* 722 F.2d 960, 973 (2d Cir.1983) (listing of cases which have required an overt act as evidence of dangerousness). Furthermore, rule 13(10) of the supreme court rules for hospitalization of mentally ill provides that "[t]he physician's diagnosis and recommendations" must include "a detailed statement of the facts, symptoms and *overt acts* observed or described to him or her, which led to the diagnosis." (Emphasis added.)

The United States Supreme Court has noted:

> A finding of "mental illness" alone cannot justify a state's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that the term can be given a reasonably precise content and that the "mentally ill" can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.

*O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396, 406–407 (1975). Several commentators have noted that predicting dangerousness is a difficult if not impossible task. *See, e.g.,* Diamond, *The Psychiatric Prediction of Dangerousness,* 123 U.Pa.L.Rev. 439 (1974).

■ There is little real dispute over what the objective evidence was on the crucial element of endangerment but the parties are poles apart on how that evidence is to be interpreted. Mohr is right in insisting that the one incident of violence, though alarming, does not qualify as recent. It is suggested on his behalf that his present mental impairment is not threatening, that his behavior qualifies only as offensive, perhaps even repugnant to persons of average sensibilities. But Mohr is on firm ground in arguing that socially unacceptable behavior cannot suffice. He thinks the evidence points to no more.

■ The evidence can be interpreted otherwise. The attack involving Mohr's father occurred many years ago but his presently expressed view of it is certainly ominous and clearly portrays a sadly twisted frame of mind. With this background his sexual overtures to total strangers and his fantasies about sexual attacks take on a threatening nature.

Dr. Klauburg, whose professional qualifications are unquestioned, expressed an unequivocal view on which interpretation should be placed on the showing:

> [I] feel that he would present a danger to himself in that I feel his judgment is impaired and also to others in that we could not predict his behavior or his acting out his delusions.

We believe and hold there was substantial evidence to support the finding of the district court that Mohr's condition poses a threat to himself and to others.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.