# IN THE COURT OF APPEALS OF IOWA

No. 13-1910
Filed October 1, 2014

IN THE MATTER OF D.Y.,
Appellant,

Alleged to be Seriously Mentally Impaired.
_____

Appeal from the Iowa District Court for Woodbury County, John D. Ackerman, Judge.

D.Y. appeals from her civil commitment following the district court's finding that she suffered from a serious mental impairment. **REVERSED.**

Zachardy S. Hindman of Bikakis, Mayne, Arneson, Hindman & Hisey, Sioux City, for appellant.

Thomas J. Miller, Attorney General, Gretchen Witte Kraemer, Assistant Attorney General, Patrick Jennings, County Attorney, and Joshua Widman, Assistant County Attorney, for appellee State.

Considered by Danilson, C.J., and Vogel and Bower, JJ.

**VOGEL, J.**

D.Y. appeals from her civil commitment following the district court's determination that she suffered from a serious mental impairment. She asserts it was not proved by clear and convincing evidence she was seriously mentally impaired to the point she was a danger to herself or others and that without commitment, she would be unable to satisfy her own physical needs such that she would suffer physically. We conclude no overt act occurred showing D.Y. was a danger to herself or others, or that she could not adequately care for herself. Consequently, substantial evidence does not support the district court's finding of dangerousness under Iowa Code section 229.1(17)(a) and (c) (2013), and we reverse.

## I. Factual and Procedural Background

On November 21, 2013, D.Y.'s sister filed an application alleging mental impairment, which stated D.Y. was not taking her medication[1] and that she was demonstrating paranoia and other concerning behavior. The application requested that D.Y. be civilly committed. A contested hearing was held on the application, in which it was established D.Y. had recently been homeless. D.Y. had travelled from Sioux City, Iowa, to Florida, then in November 2013, back to Sioux City. D.Y. testified she did not mind being homeless.

Before the hearing, D.Y. was examined by Phillip Muller, D.O. He diagnosed D.Y. with mood disorder not otherwise specified, rule out bipolar

---

[1] Testimony at the hearing established D.Y. had been prescribed Abilify and Zoloft, and that she had not been taking the medication for at least one year.

disorder, but noted alcohol, cannabis, and "meth" dependence.[2]  At the hearing,

he testified that D.Y.:

> [H]as problems with psychosis, that she has problems with paranoia, in the paperwork from the family, I remember they were indicating that she appeared to be having paranoia.  She thought people were stealing things from her and that type.  When I met with her, she indicated, at one point that her, her family was stealing from her.  When I read over the paperwork and saw that she had indicated the neighbor was stealing from her.  She also indicated that was the case.  The staff at, she had indicated that she was missing some things to the staff today.  I believe it was some socks.  There seemed to be some confusion around that.  And, and after I evaluated her and after I walked out, she came up to me and said that she had been in jail and that she said that she was not given back, I believe it was a ring from jail as well.  The police department did not return that to her.  And so, she continues to appear to have some problems with some paranoia.  She has been refusing to take any anti-psychotic medications.  That's also what the family indicated that she—that she had not been staying on any meds.  That she had been—there is also some alcohol use involved with that as well.

When asked if D.Y. was a danger to herself or others, Dr. Muller responded:

> She does seem to continue to have problems with paranoia.  As I remember, there also was some concern about that she was doing some traveling, that she would, for instance, she went out to Kansas, she was in Florida, she's been moving around to a number of different places.  I think that she had, there was something, she'd said something to the effect about that even though she had been drinking in her home apparently that's why the, they arrested her because of alcohol that she had been using.  I believe what happened is she got into some type of disagreement [with] a neighbor, and so, yes I do think that she doesn't stay on her medications.  There's some potential for her to take off and someone not know where she's going to and she not be able to take care of herself.

This opinion is reflected in the physician's report to the court, in which Dr. Muller

stated he believed D.Y. to be a danger to herself or others—as contemplated by

---

[2] Specifically, Dr. Muller testified the diagnosis of mood disorder NOS could mean she has bipolar disorder, schizo-affective disorder, or schizophrenia, which must be addressed in a future diagnostic session.  D.Y. denied any methamphetamine use.

chapter 229—and that she needed to be hospitalized. Also included in the brief facts supporting hospitalization within the doctor's report was the observation that: "She thinks people are trying to destroy her family, delusional bizarre thoughts."

Dr. Muller then proceeded to testify that the least restrictive plan would be to make sure D.Y. was on long-acting medication, at which point she could be released on an outpatient basis. When asked to clarify how D.Y. "taking off" could be a danger to herself or others, Dr. Muller stated: "I think that she's at risk to herself since, simply because she doesn't have any insight into the fact that she has these problems with the paranoia." In response to the question of whether D.Y. was able to care for herself, Dr. Muller testified that: "She appeared disheveled to me. She appeared to be guarded. She appeared to be paranoid when I met with her."

D.Y.'s sister and D.Y. also testified. The sister stated what had initially led her to file the application was a note D.Y. had given her indicating the family was going to come to harm. Specifically, the sister testified: "It was about Jesus and a prophecy and about harming the family, her family. Just, it was things like that. It was mostly about like, it was kind of like a, bible quotes and just something like that." The note did not specify who was going to harm the family.

The sister further testified about D.Y.'s inappropriate behavior towards a patient in the hospital waiting room as well as her altercation with the neighbor, in which D.Y. accused the neighbor of stealing, a verbal argument ensued, and D.Y. was arrested for public intoxication. However, the sister stated that, to her

knowledge, D.Y. has never threatened to physically harm herself or others. On cross-examination, the sister testified:

> Q: Has she ever directly threatened to hurt anybody that you know of? A: No, no. [D.Y.'s] not, she's not like, physically abusive, you know, at all. I don't think she is at all.
> Q: What about threatening to hurt herself? Has she ever done that? A: I, not that I'm aware of.

Resisting hospitalization, D.Y. denied all allegations and testified she merely has a learning disability and does not need medication.

Following the close of the evidence, the district court found D.Y. was seriously mentally impaired, and in doing so, found she was a danger to herself or others and that she was unable to care for herself. Specifically, the court stated:

> This is a close case. I'm not at all concerned that she, she has a mental illness. I don't have any question about that in my mind. My question is, is the hospitalization, continued hospitalization, the least restrictive situation for her. I do believe she lacks sufficient judgment to make responsible decisions with respect to her treatment. She does, like the doctor says, she [has] absolutely no insight into her situation. And I would find that without treatment and allowed to remain at liberty, she would be a serious, she could inflict serious injury on herself or others and [would be] unable to satisfy her own nourishment, clothing, essential medi-care— medical care, or shelter, making her physical injury, physical debilitation or death likely. That's by clear and convincing evidence. But it is very close.

The court issued its ruling on December 2, 2013, ordering that D.Y. be placed at Mercy Hospital and that she comply with all treatment recommendations. The

court assumed that after a few days in the hospital, D.Y. would be released to outpatient care.[3]  D.Y. appeals the adjudication of serious mental impairment.

## II. Standard of Review

In involuntary commitment proceedings, we review challenges to the sufficiency of the evidence for correction of errors at law.  *In re J.P.*, 574 N.W.2d 340, 342 (Iowa 1998).  The allegations made in an application for involuntary commitment must be proved by clear and convincing evidence.  *Id.*  Clear and convincing evidence "means that there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence."  *Id.* (citation and internal quotation marks omitted).

## III. Dangerousness

Under Iowa Code section 229.1(17), a person is seriously mentally impaired if she suffers from mental illness,

> [A]nd because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment, and who because of that illness meets any of the following criteria:
> a. Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment.
> b. Is likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the person with mental illness if the person with mental illness is allowed to remain at liberty without treatment.
> c. Is unable to satisfy the person's needs for nourishment, clothing, essential medical care, or shelter so that it is likely that the person will suffer physical injury, physical debilitation, or death.

These factors must be proved by clear and convincing evidence.  Iowa Code § 229.13(1).

---

[3] We note that, even though D.Y. is no longer civilly committed, a patient is presumed to suffer collateral consequences justifying appellate review, and therefore mootness does not preclude our review of the issues.  *See In re B.B.*, 826 N.W.2d 425, 430 (Iowa 2013).

D.Y. contests the district court's finding she was likely to injure herself or others and was unable to adequately care for herself. Pursuant to our case law, the danger a person poses to self or others must be evidenced by a "recent overt act, attempt or threat." *J.P.*, 574 N.W.2d at 344. The endangerment element "requires a predictive judgment, based on prior manifestations but nevertheless ultimately grounded on future rather than past danger;" however, socially unacceptable or repugnant behavior does not satisfy the overt act requirement. *In re Mohr*, 383 N.W.2d 539, 542 (Iowa 1986). Rather, an "overt act" connotes past aggressive behavior or threats by the respondent manifesting the probable commission of a dangerous act upon herself or others. *In re Foster*, 426 N.W.2d 374, 378–79 (Iowa 1988) (holding verbalized delusions do not constitute the type of overt act necessary to establish dangerousness).

The record here does not contain an overt act on the part of D.Y. demonstrating that she would be a danger to herself or others or that she cannot satisfy her need for "nourishment, clothing, essential medical care, or shelter so that it is likely that [she] will suffer physical injury, physical debilitation, or death." *See* Iowa Code § 229.1(17)(a) & (c). As an initial matter, though the State is correct in its assertion the winters in Iowa are extremely cold, D.Y. was not homeless in Iowa during the winter—she was residing with family members. Furthermore, D.Y. was clearly able to keep herself clothed and fed during this period of time, and though she appeared disheveled and unwashed with holes in her shoes, there is no indication she suffered physical harm or that she would do so in the future under similar circumstances. Given these facts, D.Y.'s

homelessness is not enough of an overt act showing she cannot satisfy her needs such that she will likely suffer injury, debilitation, or death.

Nor does the note D.Y. delivered to her sister constitute an overt act indicating dangerousness. While evidencing her paranoia, the note did not state D.Y. was going to harm the family, but, rather, that an unspecified harm might befall them. In fact, D.Y.'s sister specifically testified D.Y. had never threatened to harm herself or others. While D.Y.'s behavior toward the neighbor and the patient in the hospital waiting room could be considered socially unacceptable, and it is likely a manifestation of her mental illness, it is not enough to constitute an overt act on the part of D.Y. *See Mohr*, 383 N.W.2d at 542. Consequently, the district court improperly found D.Y. posed a danger under Iowa Code section 229.1(17)(a) and (c), and we reverse the adjudication of D.Y. as seriously mentally impaired.

**REVERSED.**