# IN THE COURT OF APPEALS OF IOWA

No. 17-1591
Filed March 7, 2018

**IN THE MATTER OF S.M.,**
**Alleged to be Seriously Mentally Impaired,**

**S.M.,**
     Respondent-Appellant.
_____

     Appeal from the Iowa District Court for Johnson County, Chad A. Kepros,

Judge.


     An inmate diagnosed with schizophrenia appeals the district court order

finding him to be seriously mentally impaired under Iowa Code chapter 229 (2017).

**AFFIRMED.**


     Sandra R. Hart of Hart Law, North Liberty, for appellant.

     Thomas J. Miller, Attorney General, and Gretchen W. Kraemer, Assistant

Attorney General, for appellee State.


     Considered by Doyle, P.J., and Tabor and McDonald, JJ.

**TABOR, Judge.**

Convicted of first-degree murder nearly forty years ago, S.M. is serving a life sentence in the custody of the Iowa Department of Corrections (DOC). S.M. has been treated for schizophrenia during his prison stay. From 2000 until 2016 he was subject to a civil commitment order as a means to enforce medication compliance. Without that enforcement, S.M. resisted taking his prescribed anti-psychotic drug and grew increasingly delusional. When S.M.'s conspiracy theories progressed to include prison staff and other inmates, and he discussed "retaliation" against them, his treating psychiatrist sought to renew the civil commitment. The district court ordered S.M. to receive treatment within the DOC at the outpatient level of care. S.M. appeals that order, contending the State did not prove he posed a danger. In light of his past actions, S.M.'s current threats and physical posturing signaled the probable commission of a harmful act upon himself or others likely to result in physical injury; we find the dangerousness element satisfied.

## I.     Facts and Prior Proceedings

S.M.'s diagnosis of schizophrenia dates back to 1977 when he was discharged from the military. S.M. admitted killing his mother in 1978 by striking her head with a large concrete lawn ornament. At his trial, S.M. claimed he suffered from a psychosis aggravated by drug and alcohol use. He nevertheless received a sentence of life without parole. Early in his prison term, around 1984, S.M. engaged in self-mutilation, cutting his testicles with a razor. He also got into two fights with fellow inmates during the 1980s. He attempted suicide in the late 1990s. The DOC records indicate S.M. has exhibited ongoing delusions and fixations involving "biker gang wars" and "rock and roll wars," as well as conspiracy

theories about murders across the country. At times, his delusions have been categorized as hyper-sexual and hyper-religious, including his declaration of a "holy war" in which he was the leader of his own church.

DOC psychiatrist Gary Keller noted S.M. had "a long history of not complying with medications and treatment, so had been on a long acting injectable medication, haloperidol, for many years." Because of his non-compliance, from 2000 until 2016, S.M. was under a mental health civil commitment at the Clarinda Correctional Facility, where he was incarcerated. In May 2017, the DOC transferred S.M. back to the Iowa Medical and Classification Center (IMCC) so that his mental illness could be better monitored and managed. According to Dr. Keller, since the commitment ended, S.M. "has refused his medication for treatment of his schizophrenia" and "has deteriorated in regard to his delusional system." Dr. Keller found S.M.'s illness has grown "much more prominent in his interactions."

In early August 2017, S.M. became convinced a corrections officer on his unit, as well as other inmates, were involved in a conspiracy involving the death of S.M.'s father. While on the prison yard, staff overheard S.M. discussing the conspiracy and bringing up "retaliation." S.M. also spoke of a "genocide scenario." In the same time period, S.M. wrote a note discussing his father's death which, according to Dr. Keller's recollection, stated "quote, they should pay for what they've done." S.M. named a particular offender in the note and also "incorporated" officers in S.M.'s living unit and acute mental health unit into his conspiratorial thinking. In a follow-up discussion with Dr. Keller, S.M. engaged in "even more delusional talk." Meanwhile, fellow inmates expressed unease about S.M.'s compulsive pacing and his aggressive demeanor. Dr. Keller also received

reports S.M. displayed "increased irritability" and intimidated other inmates when he "often flexes and tenses up in mannerisms as if he is ready to strike out." Dr. Keller opined S.M. was "starting to act on his delusional thinking."

Dr. Keller feared not only for the inmates and staff who came in contact with S.M. at the prison but also was concerned that S.M.'s manifestations of his schizophrenia were threatening S.M.'s own health. S.M. would exercise to the point of developing sores on his hands and feet and allowed his personal hygiene to decline. S.M. also was reluctant to rehydrate because he believed the water at the prison was contaminated. According to Dr. Keller, S.M. was not only refusing his anti-psychotic medication, but S.M.'s compliance with taking other prescribed medications for physical maladies had waned.

On August 7, 2017, a social worker at the IMCC filed an application for an order of involuntary hospitalization with S.M. as the respondent. Dr. Keller filed a physician's report outlining his concerns about S.M.'s mental health and increasing threats toward staff and fellow inmates. After a hearing, a judicial hospital referee found S.M. to be seriously mentally impaired within the meaning of Iowa Code chapter 229 (2017). S.M. appealed and the district court held a hearing on September 12, 2017. Dr. Keller testified that the point of the mental-health commitment was to enable staff to administer medication notwithstanding S.M.'s objection. Dr. Keller said S.M. had "incorporated" different officers on the living unit and on the acute mental-health unit into his conspiracy theories. Plus, peers indicated they were concerned about S.M.'s demeanor and avoided interactions with him. S.M. also testified, telling the court he "doesn't believe [he] is

schizophrenic." S.M. testified he dislikes the side effects of the anti-psychotic medication, which makes him lethargic, shaky, and restless.

The district court affirmed the finding of the judicial hospitalization referee, noting that during S.M.'s testimony "he quickly reverted to the delusional and conspiratorial thinking that Dr. Keller had described in his testimony. The Court agrees with Dr. Keller that [S.M.] represents a danger to himself and others at this time due to his mental illness." S.M. appeals the district court's findings.

## II.    Scope and Standards of Review

We review challenges to the sufficiency of the evidence in involuntary commitment proceedings for the correction of legal error. *In re B.B.*, 826 N.W.2d 425, 428 (Iowa 2013). The State must prove an allegation of serious mental impairment by clear and convincing evidence. Iowa Code § 229.13(1). "Clear and convincing evidence is less burdensome than evidence establishing proof beyond a reasonable doubt, but more burdensome than a preponderance of the evidence." *B.B.*, 826 N.W.2d at 428. Clear and convincing proof leaves "no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *Id.* (quoting *In re J.P.*, 574 N.W.2d 340, 342 (Iowa 1998)). The district court's factual findings are binding on us if they are supported by clear and convincing evidence. *J.P.*, 574 N.W.2d at 342.

## III.    Analysis of Endangerment Component

Involuntary hospitalization requires proof of a "serious mental impairment." *See* Iowa Code §§ 229.1(20), 229.6(2)(a)(2), 229.13(1). The code defines "serious mental impairment" as:

> [T]he condition of a person with mental illness and because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment, and who because of that illness . . . [i]s likely to physically injure the person's self or others if allowed to remain at liberty without treatment.

*Id.* § 229.1(20)(a). Only the last element, commonly referred to as the endangerment component, is at issue in this appeal.

Proving endangerment requires "predictive judgment" that is built on "prior manifestations" but focuses on future rather than past danger. *In re Mohr*, 383 N.W.2d 539, 542 (Iowa 1986). To deprive a person of their liberty through civil commitment, the State must show the person poses a danger to himself or others—evidenced by a "recent overt act, attempt or threat." *Id.* (quoting *Stamus v. Leonhardt*, 414 F.Supp. 439, 451 (S.D. Iowa 1976)). Our supreme court has held in the context of civil commitment that an "overt act connotes past aggressive behavior or threats by the respondent manifesting the probable commission of a dangerous act upon himself or others that is likely to result in physical injury." *In re Foster*, 426 N.W.2d 374, 378 (Iowa 1988).

S.M. argues the recent threats of "retaliation" attributed to him were too lacking in detail to show the likelihood that he would cause physical injury to another person. He contends writing down "they will pay" did not manifest a direct threat toward another inmate or prison staff. S.M. also insists his overt acts did not demonstrate he was likely to injure himself.

S.M. correctly points out that "socially unacceptable, even repugnant behavior" is not enough to satisfy the endangerment element. *See Mohr*, 383 N.W.2d at 542. Likewise, spouting bizarre delusions—without more—does not qualify as a recent over act. *Foster*, 426 N.W.2d at 379.

But the district court was allowed to view S.M.'s repulsive behavior and bizarre delusions in the context of the overall course of his schizophrenia. While S.M.'s murder of his mother, attempts at suicide and self-harm, and history of physical altercations with other inmates occurred years ago, they still provide a backdrop for his current threats. *See United States v. Mikawa*, 849 F.3d 445, 451 (8th Cir. 2017) (noting committed person's assault of his first wife was entitled to less weight because it occurred over twenty-five years ago but "need not be entirely discounted" (citing *United States v. Evanoff*, 10 F.3d 559, 563 (8th Cir. 1993) ("[T]he recency or remoteness of any particular activity simply affects the weight the court will give to that particular evidence."))); *see also Mohr*, 383 N.W.2d at 542 (noting attack involving Mohr's father occurred many years ago but Mohr's presently expressed view of it is was "ominous" and portrayed "a sadly twisted frame of mind" and holding "[w]ith this background his sexual overtures to total strangers and his fantasies about sexual attacks take on a threatening nature"). Given S.M.'s violent past, his recent delusions and threats implicating other inmates and prison staff were sufficient to prove dangerousness even if he did not have the opportunity to act on them. *See United States v. S.A.*, 129 F.3d 995, 1001 (8th Cir. 1997) ("The violent nature of S.A.'s visual and auditory hallucinations and his actual prior violent behavior are sufficient to support a finding that he is dangerous."). Even without action, S.M.'s physical posturing and aggressive stances made his fellow inmates nervous.

We likewise find no error in the district court's conclusion S.M's recent overt acts demonstrate a likelihood he would injure himself if not civilly committed. Beyond his threats to seek retribution against others, the record showed S.M. was

exercising to the point of injury, not drinking water, not regularly showering, and not taking prescribed medication for physical ailments. *See generally In re B.T.G.*, 784 N.W.2d 792, 798 (Iowa Ct. App. 2010) (finding substantial evidence to establish that inmate was likely to injure himself or others physically because of his mental illness when he threatened to harm prison staff and their children and was striking out at the walls and door of his cell).

The record contains substantial evidence to support the district court's conclusion S.M. has a serious mental impairment. In particular, we find clear and convincing proof S.M. is likely to injure himself or others if allowed to remain at liberty without treatment.

**AFFIRMED.**