# IN THE COURT OF APPEALS OF IOWA

No. 21-1523
Filed August 17, 2022

**IN THE MATTER OF M.P., ALLEGED TO BE SERIOUSLY MENTALLY IMPAIRED,**

**M.P.,**
 Respondent-Appellant.
_____

 Appeal from the Iowa District Court for Marion County, Steven W. Guiter, District Associate Judge.

 M.P. appeals an order for involuntary hospitalization entered under Iowa Code chapter 229 (2021). **AFFIRMED.**

 Blake D. Lubinus, Fort Ripley, Minnesota, for appellant.

 Thomas J. Miller, Attorney General, and Gretchen Witte Kraemer and Ellen Ramsey-Kacena, Assistant Attorneys General, for appellee.

 Considered by Ahlers, P.J., and Badding and Chicchelly, JJ.

**CHICCHELLY, Judge.**

M.P. appeals an order for involuntary hospitalization entered under Iowa Code chapter 229 (2021) after the district court found he is seriously mentally impaired as defined in Iowa Code section 229.1(20)(a). That section provides that a person is "seriously mentally impaired" if (1) that person has a mental illness, (2) that illness impairs the person's ability to make responsible decisions about hospitalization or treatment, and (3) that person is likely to physically injure the person's self or others if allowed to remain at liberty without treatment. Iowa Code § 229.1(20)(a). M.P. challenges the sufficiency of the evidence showing each of these elements. Because the evidence supports the district court's finding, we affirm.

We review the sufficiency of the evidence supporting involuntary commitment for correction of errors at law. *See In re L.H.*, 890 N.W.2d 333, 339 (Iowa Ct. App. 2016). The district court's fact findings are binding if supported by substantial evidence. *See id.* "Evidence is substantial if a reasonable trier of fact could conclude the findings were established by clear and convincing evidence." *Id.* (citation omitted).

*1. Mental Illness.*

We begin with whether substantial evidence shows M.P. has a mental illness. With some exceptions not relevant here, Iowa Code section 229.1(11) defines "mental illness" as "every type of mental disease or mental disorder." Dr. Eric Barlow, a psychiatrist who is certified by the American Board of Psychiatry and Neurology, examined M.P. and diagnosed him with Borderline Disorder Type I

with psychotic issues, which meets the definition of mental illness. Based on this diagnosis, the district court found M.P. has a mental illness.

M.P. questions Dr. Barlow's ability to make a diagnosis, arguing that Dr. Barlow "could not actually evaluate [him] due to [his] refusal to even speak with Dr. Barlow." Dr. Barlow testified that M.P. refused to speak to him or other staff and refused treatment. But Dr. Barlow noted that M.P. made statements in his presence, testifying that M.P. "refused to speak with me saying that everyone is racist and he was not going to be playing games."

Dr. Barlow also relied on the observations of M.P.'s mother and sister in diagnosing M.P. *See* Iowa R. Ct. 12.13 (requiring the physician's report to include a diagnosis and the detailed reasons that led to it, including "overt acts observed *or described to the physician*" (emphasis added)). In the application alleging M.P. has a serious mental impairment, M.P.'s mother stated that M.P. has a mental illness and "thinks he is God." She described M.P. as having visual and auditory hallucinations that he responded to, once stating that he was in "spiritual warfare." She also detailed two previous involuntary commitments of M.P., one in Iowa and one in Arizona. In a supporting affidavit from M.P.'s sister accompanying the application, M.P.'s sister reiterated their mother's concerns, stating that M.P. "thinks and believes he is God" and "hears and sees things that aren't there" that "follow him [wherever] he goes," "wake him up," and "surround his car."

Finally, Dr. Barlow considered M.P.'s refusal to speak with him in making his diagnosis. He stated that "if someone was having a bunch of false allegations against him, I would think that person would want to explain himself, but he has been very angry and very irritable and adamantly refuses to speak to either myself

or any of my medical residents on rounds." The doctor testified that refusing to speak to the staff fit his diagnosis and the historical information provided by M.P.'s mother and sister.

M.P. argues that the record lacks diagnostic criteria. Although Dr. Barlow did not discuss the diagnostic criteria for Borderline Disorder Type I with psychotic issues, he testified that he made that diagnosis based on his education, training, and experience as a psychiatrist. In both his physician's report and testimony, Dr. Barlow explained the facts he relied on in diagnosing M.P. He confirmed his diagnosis in the second physician's report, entered two weeks later. Substantial evidence supports the finding that M.P. has a mental illness based on Dr. Barlow's diagnosis.

*2. Deciding Treatment.*

We next consider whether M.P. can make responsible decisions about his treatment, "whether the decision is to seek treatment or not." *L.H.*, 890 N.W.2d at 340 (citation omitted). The district court found M.P. could not do so, noting that he "has refused to talk to the doctor and medical staff and has refused medications" for a treatable illness. Denying treatment despite conclusive evidence showing a serious need for help "is a significant indication of [an] inability to make a rational decision about treatment." *In re Mohr*, 383 N.W.2d 539, 541 (Iowa 1986).

M.P. does not dispute that he refused treatment; he contends there is no conclusive showing that he *needs* treatment. But the evidence shows M.P. has a mental illness that causes hallucinations and delusions, which has led to combative behavior, threats to others, and destruction of property. Dr. Barlow testified that refusing to take medication or speak to medical staff is "a sign that

[M.P.] may be even more severe than someone who comes in with these types of symptoms and these types of behaviors and realizes that there's a problem, and they need help. There's no insight in this situation." Substantial evidence supports the finding that M.P. cannot make responsible decisions about his own treatment.

*3. Likelihood to Physically Injure Self or Others.*

Finally, we turn to whether substantial evidence shows M.P. is likely to physically injure himself or others if allowed to remain at liberty without treatment. An act is "likely" if it is "probable or reasonably to be expected." *Id.* at 542 (citation omitted). The danger one poses to oneself or others must be evidenced by a "recent overt act, attempt or threat." *Id.* "An 'overt act' is 'past aggressive behavior or threats by the respondent manifesting the probable commission of a dangerous act upon himself or others that is likely to result in physical injury.'" *L.H.*, 890 N.W.2d at 341 (citation omitted).

In finding M.P. presents a danger to himself or others, the district court relied on statements made by M.P.'s mother and sister. In her application, M.P.'s mother states that M.P. threatened to kill her, his sister, and his sister's children. She also noted that M.P.'s behavior had led to criminal charges, for which he spent three months in jail. M.P.'s sister stated in her affidavit that M.P. "said he would take [her] whole home out and that he would put a bullet to his brain."

M.P.'s mother testified in more detail at the commitment hearing. When asked what type of behaviors led her to file the application, she explained:

> He hears voices, he has told us. . . . [S]ometimes he talks like he's talking to someone, and there's no one there. He yells and screams at people that . . . aren't even interacting with him. He has threatened to kill himself. He's told me many times that he put a bullet in his brain, and he can't work because things bother him. And

he thinks that people are, I don't know, saying things to him and making gestures at him when in fact that's not true.

Just last week at my daughter's trailer court the manager— and when the neighbors were walking down the street and picking up trash because that's what the maintenance man does, and [M.P.] apparently thought they were pointing at him and raising their fists to him. And the neighbor called my daughter and said we just went, you know, past your trailer because there's a man outside, and he's yelling and screaming at us. And she said, "Oh, I'm sorry. That's my brother." And they said, "Well, we're just ignoring him."

. . . .

. . . [H]e's told me before that "I should just kill you and [my sister] . . . and her kids." And that's where he went after he got out of jail, because that's where his car was. . . . [S]o when he got out he went to his sister's house, but he can't live there. And when I tried talk to him about that, he said, "I can stay there as long as I want to." And then he threatened—he said, "I ought to just kill you" . . . .

M.P. argues there is no evidence that any of these acts are recent, claiming his mother's testimony did not fix the incidents she described within any specific time range. But M.P. testified that he was released from jail two weeks before the hearing. In her application, M.P.'s mother states that M.P. told her his only option after his release from jail was to kill himself. She also testified that the incident involving M.P. yelling at his sister's neighbors occurred "just last week." In addition, Dr. Barlow testified that M.P. was "very hostile to staff" at the medical facility and some staff members "felt very intimidated by him." Although M.P. had not engaged in any physical violence toward the staff, Dr. Barlow concluded that M.P. is likely to physically injure himself and others if left untreated. Substantial evidence supports the finding that M.P. is likely to physically injure himself or others if allowed to remain at liberty without treatment.

Because substantial evidence shows M.P. is seriously mentally impaired, we affirm.

**AFFIRMED.**